[No. B009809. Second Dist., Div. Two. May 30, 1985.]

PHILLIP M. NOBLE et al., Plaintiffs and Respondents, v.
LOS ANGELES DODGERS, INC., Defendant and Appellant.

**COUNSEL**

James E. Cusick, Richard J. Hildebrandt and Harry D. Boyd for Defendant and Appellant.

Stephanie Nordlinger and Ralph M. Singer for Plaintiffs and Respondents.

## OPINION

**COMPTON, J.**—Plaintiffs Philip and Marlene Noble, in company with one David McIntosh, attended a night baseball game at Dodgers Stadium. After the game had ended and as they were returning to their car in the stadium parking lot, they observed, what according to them, were two drunks standing by the car—one was vomiting and one was urinating on the car.

Plaintiff Philip Noble remonstrated with the individuals, whereupon the two began to shout obscenities. When David McIntosh approached the miscreants one of them struck him. Philip was knocked down and injured when he attempted to intercede in defense of David McIntosh. The actual number of persons involved in this melee is not made clear by the record.

In an action brought against the Los Angeles Dodgers, Inc. (Dodgers), the jury awarded compensatory damages to Philip for his injuries and to Marlene for the emotional distress which she suffered in witnessing the injury to her husband. The jury, however, found that plaintiff Philip was 55 percent responsible for his injuries and that Marlene was 35 percent[1] responsible for her injuries.

The Dodgers have appealed. We reverse.

Laying aside for the moment the fact that the jury in effect found that plaintiff Philip Noble was the primary cause of his own injuries, we approach the analysis of this case on the basis that plaintiffs' theory of liability is that the Dodgers negligently failed to protect them against physical assault by third parties.

■ A landowner is not an insurer of the safety of persons on his property. He does, however, have a duty to take reasonable steps to protect invitees from *foreseeable* injury even to the extent of controlling the conduct of third parties. (Rest. 2d Torts, § 344; *Taylor* v. *Centennial Bowl, Inc.* (1966) 65 Cal.2d 114 [52 Cal.Rptr. 561, 416 P.2d 793].)

■ It is a sad commentary but it can be said that in this day and age anyone can foresee or expect that a crime will be committed at any time

---

[1] These verdicts indicate to us that the jury was hopelessly confused on the issue of liability. Marlene's injury was solely attributable to seeing her husband injured. What conduct on her part was 35 percent the cause of her injury is a mystery. Further, the verdicts reflect that in the case of Philip the remaining 45 percent of the liability was attributable to defendant and "other persons," and in the case of Marlene, the other 65 percent is also attributable to the defendant and "other persons." The record does not disclose any breakdown between the defendant and these other persons or just who these other persons were.

and at any place in the more populous areas of the country. That fact alone, however, is not enough to impose liability on a property owner when a crime does in fact occur on his or her property.

Case law has taken a rather uncertain and nonuniform approach in providing compensation by the property owner for victims of criminal activity occurring on the property. Most of the reported decisions have dealt with cases at the pleading stage or on appeal from a summary judgment in favor of the property owners, and have varied in result according to a particular court's view of the plaintiff's allegations concerning a "special" foreseeability which set the land owner apart from the community at large.

In its most recent pronouncement on the subject the California Supreme Court has held simply that "foreseeability" must be decided on a "case-by-case basis" and after a consideration of the totality of the circumstances. (*Isaacs* v. *Huntington Memorial Hospital* (1984) 38 Cal.3d 112 [211 Cal.Rptr. 356, 695 P.2d 653].)

There is evidence that during the preceding 66 night games at Dodger Stadium, there had been 5 reported fights in the parking lot. There of course had been occasional reports of various other types of problems that could be expected whenever large crowds are assembled. Past incidents of misconduct on the part of attendees were, however, more frequent *inside the stadium* than outside.

It is not necessary to discuss here whether the Dodgers, because of the foreseeability of such incidents, had any duty to protect plaintiffs against what occurred. Plaintiffs offered no evidence that there were any *reasonable* steps which the Dodgers could have taken to prevent it or that inaction on the part of the Dodgers in any way caused plaintiffs' injuries.

The court in *Isaacs, supra,* 38 Cal.3d 112, stated that when foreseeability gives rise to a duty to protect, it is for the fact finder to determine the "adequacy" of the security or measures taken to prevent injury. We do not understand this to mean, however, that that determination be made absent evidence that some action on the part of the defendant could have prevented the injury or conversely that the defendants' inaction in some manner *caused* plaintiff's injury.

Except for the enigmatic reference in *Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at page 131, footnote 8, to language used in another context in *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], to the effect that " '[a]n affirmative finding on foreseeability by the jury would obviously establish . . . a sufficiently

"close[] connection between the defendant[s'] conduct and the injury suffered,"'" none of the cases which have come to our attention seem to have focused on the element of causation, which remains a necessary ingredient of the plaintiff's case.

■   We understand the law still to require that a plaintiff, in order to establish liability, must prove more than abstract negligence unconnected to the injury.

■   In cases in which the specific conduct of third parties is brought to the attention of a defendant property owner sufficiently in advance of the injury to give the defendant an opportunity to act to prevent the injury, the causal connection between failure to act and the injury is patent. (See *Pfeifer* v. *Standard Gateway Theatre* (1951) 259 Wis. 333 [48 N.W.2d 505]; *Stillwell* v. *City of Louisville* (Ky. 1970) 455 S.W.2d 56; Annot., 75 A.L.R.3d 441.)

Thus in *Sample* v. *Eaton* (1956) 145 Cal.App.2d 312 [302 P.2d 431], where plaintiff was hit by a thrown bottle at a wrestling match at the Olympic Auditorium, the Court of Appeal reversed a nonsuit because evidence showed that for six or seven minutes prior to the incident patrons were fighting and throwing objects and the management of the auditorium did not take steps to curtail it or stop it.

We are, however, unaware of any case in which a judgment against the property owner has been affirmed solely on the basis of a failure to provide an adequate deterrence to criminal conduct in general.

As we commented in *7735 Hollywood Blvd. Venture* v. *Superior Court* (1981) 116 Cal.App.3d 901, at pages 905-906 [172 Cal.Rptr. 528]: "It would be intolerable and grossly unfair to permit a lay jury, after the fact, to determine in any case that security measures were 'inadequate,' especially in light of the fact that the decision would always be rendered in a case where the security had in fact proved to be inadequate. . . . [¶] Anyone can foresee that a crime may be committed anywhere at any time. But that foreseeability which the owners of rental property or the proprietors of public premises share with the public at large, does not, per se, impose a duty on such property owners or proprietors to install a 'security device' which meets a lay jury's concept of adequacy."

It appears that a growth industry is developing consisting of experts who will advise and testify as to what, in their opinion, constitutes "adequate security." The $64 question, of course, is "adequate for what?" As noted, in each case where such testimony would be relevant, the security in exis-

tence has already proven to be inadequate to prevent the injury which did occur.

The question then to be determined by the jury is what reasonable steps could have been taken to prevent plaintiff's injury? The purpose of a trial in this type of case is not simply to critique defendant's security measures and to compare them to some abstract standards espoused by a so-called "security expert." The objective is to determine whether a particular defendant should, under the circumstances, be held liable for a plaintiff's injury because of a failure to prevent the criminal actions of a third party. We submit that causation is a critical question.

In the case at bench the direct cause of each plaintiff's injury was the conduct of the person or persons who struck Philip. Plaintiffs do not contend that the Dodgers had actual advance knowledge of the conduct of the assailants or of their presence in the parking lot. Plaintiffs' theory is purely and simply that the Dodgers were negligent in failing to effectively *deter* any and everyone from acting in such a manner.

In that vein plaintiffs produced an expert who testified that in his opinion the Dodgers' security was inadequate. He further opined that there should have been seven more individuals employed by the Dodgers for security purposes and that the personnel should have been deployed differently than they were. He did not, and of course could not, say that these additional seven persons or a different deployment pattern would have prevented the plaintiff's injury. In essence, he simply stated that he thought his method of policing the parking lot was better than the one the Dodgers used.

On the night of the incident approximately 52,000 persons attended the ball game. The parking lot which along with the stadium itself covers about 250 acres and which holds 20,000 cars, was full. By the time plaintiffs reached their car, however, the lot was about half empty. Cars were slowly moving out of the lot and a large number of persons were still walking through the lot.

The Dodgers had approximately 69 people assigned to security duties on the night in question. Some of those were stationed at various points inside and some outside the stadium. They thus had 1 security person for every 900 customers. Some were on mobile patrol.

The Los Angeles Police Department presently employs approximately 7,000 police officers to police a city of approximately 3 million people, this computes to approximately 1 policeman to 425 persons. When we consider that only approximately one-third of those police officers can be on duty at

any one time during a 24-hour period, the equation becomes 1 officer to approximately 1,200 inhabitants and the officers are scattered over a much wider area than the relatively compact confines of the Dodger complex.

No one can reasonably contend that even a significant increase in police personnel will prevent all crime or any particular crime.[2] Police officials and security experts, such as here, may differ in their opinion on just how police or security personnel should be deployed, but that dispute is in the context of how to achieve the greatest degree of suppression with the re-sources available and not to prevent all crime or any particular crime.

Further it is one thing for an expert to testify concerning the mechanical devices such as locks, safes, fences, etc. which are designed to protect property by "hardening the target," it is quite another for such expert to discuss deterring conduct such as rape, robbery or physical assaults.

As one court has stated: " 'It is an easy matter to know whether a stairway is defective and what repairs will put it in order . . . . but how can one know what measures will protect against the thug, the narcotic addict, the degenerate, the psychopath and the psychotic?' (*Goldberg* v. *Housing Auth. of Newark* (1962) 38 N.J. 578 [186 A.2d 291, at p. 297, 10 A.L.R.3d 595].)" (*7735 Hollywood Blvd. Venture* v. *Superior Court, supra,* 116 Cal.App.3d at p. 905.)

The present case is a classic example of a plaintiff establishing what could be described as abstract negligence, in the context that the Dodgers' security didn't comport with plaintiffs' expert's or the jury's notion of "adequacy," but failing to prove any causal connection between that negligence and the injury.

The fact that the jury found plaintiff Philip Noble to be the primary cause of his own injury, further weakens plaintiff's theory of liability on the part

---

[2]Government Code section 845 provides that: "Neither a public entity nor a public em-ployee is liable for failure to establish a police department or otherwise provide police protection service or, *if police protection service is provided, for failure to provide sufficient police protection service.*" (Italics added.)

That section is clear recognition of the difficulty, if not impossibility, of assessing the efficacy of a particular policing pattern and is designed to immunize public entities from speculative law suits such as the case at bench.

It seems anomalous to us that a public entity which has the primary role in providing police protection is so immunized while persons not generally considered to have that gen-eral responsibility are not so immunized.

It also appears anomalous that at a time when the trend in the law is to control the conduct of police and render them less effective in deterring crime, the law should at the same time encourage the expansion of private police forces who necessarily are less professional, less trained and less qualified than the regular constabulary.

of the Dodgers. Plaintiffs cannot claim that the Dodgers had any duty to control their conduct or to protect them against themselves. It could hardly be seriously contended that when someone instigates a fight on the Dodger parking lot, as the jury apparently found that Philip did, that the Dodgers should guarantee that he win the fight or that the other party not fight back. The evidence here is simply insufficient to support the judgment.

The judgment is reversed.

Roth, P. J., and Beach, J., concurred.

A petition for a rehearing was denied July 1, 1985, pursuant to rule 27(e), California Rules of Court. Respondents' petition for review by the Supreme Court was denied August 22, 1985. Mosk, J., did not participate therein. Bird, C. J., was of the opinion that the petition should be granted.