[No. B059833. Second Dist., Div. One. June 9, 1993.]

NOLA M., Plaintiff and Respondent, v.
UNIVERSITY OF SOUTHERN CALIFORNIA, Defendant and Appellant.

422

**COUNSEL**

Christian E. Markey, Jr., Mireille F. Gotsis, J. Andrew Coombs, Horvitz & Levy, Frederic D. Cohen and Douglas G. Benedon for Defendant and Appellant.

Mandell, Lewis & Goldberg, Michael L. Goldberg, David M. Lewis, Fletcher & Roit, Natasha Roit and Eric Lagin for Plaintiff and Respondent.

## Opinion

**VOGEL (Miriam A.), J.**—Nola M. was attacked and raped on the campus of the University of Southern California. She sued USC and won, on a theory that the university was negligent in failing to deter the attack. At trial, Nola's expert criticized USC's security measures and found them wanting but he did not, and on the facts of this case could not, say that 2 or 10 or 20 more guards or other security measures could have prevented Nola's injuries. Since abstract negligence unconnected to an injury will not support liability, we reverse.

### Facts

Nola drove onto USC's main campus early one evening, intending to drop off a deposit at the USC Federal Credit Union. She parked her car across the street from the credit union building, walked down the street and cut across a lawn to the sidewalk in front of the human resources center, just to the east of the credit union building. As Nola walked along the front of the human resources center, she was grabbed from behind by an unknown assailant, stabbed, beaten, pushed to the ground, dragged to some bushes in front of the human resources center and raped. About 30 to 45 minutes later, Nola heard a car drive by and screamed. Her assailant fled, taking her purse. The car stopped and two unidentified men got out. One tried (without success) to catch the assailant and the other took Nola to a campus security station.

Nola sued USC. At trial, the following evidence was presented (we have omitted the evidence relevant only to damage issues). There were somewhere between 63 and 78 on-campus violent crimes during the 2 or 3 years immediately preceding this attack (although there were no violent crimes of any kind in the immediate area of the credit union). Nevertheless, during the three years preceding the attack, the *on-campus* violent "crimes against persons" rate per thousand people was less than 1 percent—compared to a 30 percent rate in the *off-campus* area surrounding USC. USC's security department includes highly trained armed security officers and unarmed community service officers. Each twenty-four-hour period is divided into three shifts with a usual complement of five officers (one supervisor and four armed officers) working each shift. At the beginning of each shift, there is a briefing to review daily incident reports and previous watch summaries, after which each officer patrols an assigned area.

On the evening of this assault (January 2, 1989), one supervisor and eight officers worked the 3:00 p.m. to 11:00 p.m. shift (the attack occurred around 7:30 p.m.)[1] and the eight officers were responsible for patrolling four previously established areas. One officer was assigned to area A, where the credit union is located, and one officer was assigned to area B, the area immediately adjacent to the credit union. Two officers were assigned to area C, an off-campus area, and two were assigned to area E, the parking structures. The five officers assigned to areas B, C and E were instructed to also patrol area A. Area D, an "umbrella" beat providing additional patrols for areas A, B and C, was covered by the remaining two officers. Four cars were used by the eight officers to patrol the campus and adjacent area (slightly more than one-quarter of a square mile). By comparison, the Los Angeles Police Department uses seven to nine cars to patrol the ten-and-one-half square-mile area surrounding USC's campus.

Nola's expert (an independent security consultant) sharply criticized USC's security efforts. He found fault with the manner in which the security officers were permitted to exercise discretion about where to patrol; suggested the security department should have used a "pin map" to mark crime trends and patterns or "a fairly sophisticated computer system;" said there was insufficient communication both up and down the chain of command; criticized the use of patrol cars and said there should have been foot patrols to ensure coverage of all footpaths; and opined that, given the size of the area to be policed, there should have been more security officers.

He also testified that it is important for an area around a financial institution to be clear and unobstructed so that a person approaching the building can determine whether anyone is loitering nearby and so that security officers on patrol do not have their observations obscured. In the expert's opinion, four-foot high foliage in front of the human resources center posed a security risk and the combination of inadequate lighting and dense, high foliage compounded the problem.[2] Nola's expert did not testify that compliance with his personal standards would have prevented the attack on Nola. USC's expert (who is also an independent security consultant) disagreed with just about everything Nola's expert had to say.

In a bifurcated trial, the jury returned its verdict in favor of Nola, awarding her $800,000 net for compensatory damages and $988,888 in

---

[1] The double coverage was part of a tactical alert following several rapes reported around the off-campus residential facilities during the latter part of 1988. That rapist had been caught in November 1988 but the alert was continued to the end of January 1989 to allay the fears of students and staff.

[2] There was a banana tree, a palm tree, a potocarpus tree and two bird of paradise bushes separated by a hedge of about two to three feet in height.

punitive damages. On USC's motion, the trial court agreed to grant a new trial unless Nola accepted reduced compensatory damages of $300,000 net. Nola acquiesced, and USC appeals from the judgment ($1,288,888) thereafter entered.

## DISCUSSION

USC contends there is no proof of any causal connection between its negligence and Nola's injury. We agree (and we therefore do not reach USC's other claims of error).

## I.

■ According to the Restatement Second of Torts, an "actor is liable for an invasion of an interest of another, if: (a) the interest invaded is protected against unintentional invasion, and (b) the conduct of the actor is negligent with respect to the other, or a class of persons within which he is included, and (c) the actor's conduct is a legal cause of the invasion . . . ." (Rest.2d Torts, § 281.) In more traditional terms, this means there has to be (a) a duty and (b) a breach of that duty which (c) is the legal cause of the other's injury. (Rest.2d Torts, § 281, coms. on clauses (a), (b) and (c).)

### A.  *Duty*

■ There are a number of situations in the law of negligence where a defendant, including a landowner, may be liable for providing or not removing the opportunity for another to do harm. (*Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200, 205 [223 Cal.Rptr. 645].) If the place or character of the landowner's business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it and to use such means of protection as are available to afford reasonable protection. (Rest.2d Torts, § 344, com. d; *Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 123-124 [211 Cal.Rptr. 356, 695 P.2d 653, A.L.R.4th 1747]; Civ. Code, § 1714.)

■ Duty is a question of law to be determined on a case-by-case basis. (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].) If the court finds the defendant was under a duty to protect the plaintiff, the trier of fact must then decide whether the defendant's protective measures were reasonable under the circumstances—that is, whether there was a breach of the defendant's duty of care. (*Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at p. 131.) If the jury

determines there was a breach, there still remains the question whether that breach was the cause of the plaintiff's injuries. Although USC continues to assert that it was not negligent (that it did not breach any duty it owed to Nola), it does not dispute that a duty was owed. To progress directly to causation, the critical issue in this case, we simply assume the evidence is sufficient to support breach.[3]

### B.   *Causation*

■   Under section 430 of the Restatement Second of Torts, "[i]n order that a negligent actor shall be liable for another's harm, it is necessary not only that the actor's conduct be negligent toward the other, but also that the negligence of the actor be a legal cause of the other's harm." "Legal cause" exists if the actor's conduct is a "substantial factor" in bringing about the harm and there is no rule of law relieving the actor from liability. (Rest.2d Torts, § 431; *Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1052 [1 Cal.Rptr.2d 913, 819 P.2d 872].)

■   In the context of this case, the causation analysis is unaffected by the fact that the assailant's conduct was criminal and not merely negligent. Stated in traditional terms, the assailant's attack is not a superseding cause and it does not relieve USC of liability. As our Supreme Court has explained, if the likelihood that a third person may act in a particular manner is "one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby." (Rest.2d Torts, § 449; *Richardson* v. *Ham* (1955) 44 Cal.2d 772, 777 [285 P.2d 269]; *Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 58 [192 Cal.Rptr. 857, 665 P.2d 947].)[4]

The question, therefore, is whether there is evidence supporting the jury's finding that USC's negligence was the legal cause of Nola's injuries.

---

[3]When no duty exists, the liability analysis is over and it doesn't matter where the land is located or who has previously done what to whom upon it, nor does it matter how many invitees have been maimed or murdered. (See *Lopez* v. *McDonald's Corp.* (1987) 193 Cal.App.3d 495, 504-512 [238 Cal.Rptr. 436].)

[4]In *Richardson* v. *Ham*, the operator of a bulldozer left it unlocked and accessible. Several young men took it joyriding, ultimately lost control of it and injured the plaintiffs who, in turn, sued the bulldozer's owners. The Supreme Court rejected the argument that the intentional act (joyriding) constituted a superseding cause. (*Richardson* v. *Ham, supra,* 44 Cal.2d at p. 777.) In *Bigbee* v. *Pacific Tel. & Tel. Co.*, a man injured when an automobile struck the telephone booth in which he was standing sued the telephone company and others responsible for the design, location, installation and maintenance of the booth. The Supreme Court found it was of "no consequence" that the harm to the plaintiff came about through the negligent or reckless conduct of a third person. (*Bigbee* v. *Pacific Tel. & Tel. Co., supra,* 34 Cal.3d at pp. 58-59; see also *Weirum* v. *RKO General, Inc., supra,* 15 Cal.3d at p. 47; *Campodonico* v. *State Auto Parks, Inc.* (1970) 10 Cal.App.3d 803, 808 [89 Cal.Rptr. 270].)

(*Constance B.* v. *State of California, supra,* 178 Cal.App.3d at p. 207 [given a breach of duty by the defendant, the decision whether that breach caused the damage is for the jury; but where reasonable minds will not dispute the absence of causation, the question is one of law].)[5]

## C.  *Proof of Causation*

Very little has been written about the sort of proof it takes to establish causation in third party cases.[6]

---

[5]Dicta in a footnote in *Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d at page 131, footnote 8, suggests that an affirmative finding of duty, which includes a finding of foreseeability, would necessarily establish causation. The case cited for that rather astonishing proposition (*Bigbee* v. *Pacific Tel. & Tel. Co., supra,* 34 Cal.3d at pp. 59-60, fn. 14) discusses duty, not causation, and refers to the "closeness of the connection between the defendant's conduct and the injury suffered" as that phrase is used in the duty analysis first articulated in *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112-113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]. We therefore treat the *Isaacs* dictum as a simple slip of the pen. (See *Noble* v. *Los Angeles Dodgers, Inc.* (1985) 168 Cal.App.3d 912, 915-916 [214 Cal.Rptr. 395], which notes and then ignores *Isaacs*'s "enigmatic reference" to causation.)

[6]Which is not to say that the facts of this case are unique. (See e.g., *Thomas* v. *Studio Amusements, Inc.* (1942) 50 Cal.App.2d 538 [123 P.2d 552] [woman injured by another patron while skating at a rink sued rink's operator]; *Edwards* v. *Hollywood Canteen* (1946) 27 Cal.2d 802 [167 P.2d 729] [volunteer hostess injured while dancing at a canteen sued canteen's owner]; *Harper* v. *Vallejo Housing Authority* (1951) 104 Cal.App.2d 621 [232 P.2d 262] [child hit by a car while playing in a recreational area provided by a public housing authority sued housing authority]; *Taylor* v. *Centennial Bowl, Inc.* (1966) 65 Cal.2d 114 [52 Cal.Rptr. 561, 416 P.2d 793] [woman attacked in a parking lot adjacent to a bar where she had been drinking sued bar's owner]; *Campodonico* v. *State Auto Parks, Inc., supra,* 10 Cal.App.3d 803 [woman attacked in parking lot sued lot's owners]; *Totten* v. *More Oakland Residential Housing, Inc.* (1976) 63 Cal.App.3d 538 [134 Cal.Rptr. 29] [minor injured during gunfight in laundry room of apartment building sued owner of building]; *O'Hara* v. *Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798 [142 Cal.Rptr. 487] [tenant raped in her apartment sued landlord]; *7735 Hollywood Blvd. Venture* v. *Superior Court* (1981) 116 Cal.App.3d 901 [172 Cal.Rptr. 528] [tenant raped in her apartment sued building's owner]; *Wingard* v. *Safeway Stores, Inc.* (1981) 123 Cal.App.3d 37 [176 Cal.Rptr. 320] [female security guard raped by intruder while on duty at warehouse sued warehouse's owner]; *Kwaitkowski* v. *Superior Trading Co.* (1981) 123 Cal.App.3d 324 [176 Cal.Rptr. 494] [tenant raped in dimly lit lobby sued building's owner]; *Gomez* v. *Ticor* (1983) 145 Cal.App.3d 622 [193 Cal.Rptr. 600] [survivors of man shot by robbers while returning to his parked car sued owner of parking structure]; *Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799 [205 Cal.Rptr. 842, 685 P.2d 1193] [female college student assaulted in campus parking lot sued college]; *Penner* v. *Falk* (1984) 153 Cal.App.3d 858 [200 Cal.Rptr. 661] [tenant assaulted and robbed in common hallway sued landlord]; *Cohen* v. *Southland Corp.* (1984) 157 Cal.App.3d 130 [203 Cal.Rptr. 572] [customer shot during robbery of convenience store sued store's owner]; *Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d 112 [doctor shot in hospital's parking lot sued hospital]; *Gregorian* v. *National Convenience Stores, Inc.* (1985) 174 Cal.App.3d 944 [220 Cal.Rptr. 302] [customer attacked in convenience store sued store]; *Frances T.* v. *Village Green Owners Assn.* (1986) 42 Cal.3d 490 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447] [condominium owner raped and robbed in her unit sued condominium association].)

### 1.

In *Noble* v. *Los Angeles Dodgers, Inc., supra,* 168 Cal.App.3d 912, a husband and wife attended a night baseball game at Dodger Stadium. As they returned to their car at the end of the game, the husband was injured when he came to the aid of another man who had been attacked by two drunks. The Nobles sued the owner of the stadium for damages and won. The Court of Appeal reversed, finding the evidence insufficient to establish causation.

Starting from the premise that it would be grossly unfair to permit a lay jury, after the fact, to determine in any case that security measures were "inadequate," particularly in light of the fact that the decision would always be rendered in a case where the security had, in fact, proved inadequate, the court observed: "It appears that a growth industry is developing consisting of experts who will advise and testify as to what, in their opinion, constitutes 'adequate security.' The $64 question, of course, is 'adequate for what?' . . .

"The question then to be determined by the jury is what reasonable steps could have been taken to prevent plaintiff's injury? The purpose of a trial in this type of case is not simply to critique defendant's security measures and to compare them to some abstract standards espoused by a so-called 'security expert.' The objective is to determine whether a particular defendant should, under the circumstances, be held liable for a plaintiff's injury because of a failure to prevent the criminal actions of a third party. We submit that causation is a critical question.

"In the case at bench the direct cause of each plaintiff's injury was the conduct of the person . . . who struck [plaintiff]. Plaintiffs do not contend that the Dodgers had actual advance knowledge of the conduct of the assailants or of their presence in the parking lot. Plaintiffs' theory is purely and simply that the Dodgers were negligent in failing to effectively *deter* any and everyone from acting in such a manner." (168 Cal.App.3d at pp. 916-917.)

In *Noble,* the "plaintiffs produced an expert who testified that in his opinion the Dodgers' security was inadequate. He further opined that there should have been seven more individuals employed by the Dodgers for security purposes and that the personnel should have been deployed differently than they were. He did not, and of course could not, say that these additional seven persons or a different deployment pattern would have prevented the plaintiff's injury. In essence, he simply stated that he thought

his method of policing the parking lot was better than the one the Dodgers used.

"On the night of the incident approximately 52,000 persons attended the ball game. The parking lot which along with the stadium itself covers about 250 acres and which holds 20,000 cars, was full. By the time plaintiffs reached their car, however, the lot was about half empty. Cars were slowly moving out of the lot and a large number of persons were still walking through the lot. [¶] The Dodgers had approximately 69 people assigned to security duties on the night in question. Some of those were stationed at various points inside and some outside the stadium. They thus had 1 security person for every 900 customers. Some were on mobile patrol." (168 Cal.App.3d at p. 917.)

When *Noble* was decided in 1985, the "Los Angeles Police Department . . . employ[ed] approximately 7,000 police officers to police a city of approximately 3 million people, [which] computes to approximately 1 policeman to 425 persons. When we consider that only approximately one-third of those police officers can be on duty at any one time during a 24-hour period, the equation becomes 1 officer to approximately 1,200 inhabitants and the officers are scattered over a much wider area than the relatively compact confines of the Dodger complex." (168 Cal.App.3d at pp. 917-918.)

*Noble* concludes with the following thoughts: "No one can reasonably contend that even a significant increase in police personnel will prevent all crime or any particular crime. Police officials and security experts, such as here, may differ in their opinion on just how police or security personnel should be deployed, but that dispute is in the context of how to achieve the greatest degree of suppression with the resources available and not to prevent all crime or any particular crime.

"Further it is one thing for an expert to testify concerning the mechanical devices such as locks, safes, fences, etc. which are designed to protect property by 'hardening the target,' it is quite another for such expert to discuss deterring conduct such as rape, robbery or physical assaults. [¶] As one court has stated: ' "It is an easy matter to know whether a stairway is defective and what repairs will put it in order . . . . but how can one know what measures will protect against the thug, the narcotic addict, the degenerate, the psychopath and the psychotic?" (*Goldberg* v. *Housing Auth. of Newark* (1962) 38 N.J. 578 [186 A.2d 291], at p. 297, 10 A.L.R.3d 595].)' (*7735 Hollywood Blvd. Venture* v. *Superior Court* [1981] 116 Cal.App.3d [901], 905 [172 Cal.Rptr. 528].)

"The present case is a classic example of a plaintiff establishing what could be described as abstract negligence, in the context that the Dodgers'

security didn't comport with plaintiffs' expert's or the jury's notion of 'adequacy,' but failing to prove any causal connection between that negligence and the injury." (*Noble* v. *Los Angeles Dodgers, Inc., supra,* 168 Cal.App.3d at p. 918, fn. omitted.)

2.

In *Constance B.* v. *State of California, supra,* 178 Cal.App.3d 200, a woman assaulted in the restroom of a state-owned roadside rest area sued the state for damages. On the plaintiff's appeal from a summary judgment in favor of the state, the Court of Appeal refused to hold the state liable for a failure to undertake security measures sufficient to protect the plaintiff from a criminal assault.

Relying on *Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d 112, the *Constance B.* court felt "constrained" to find that even in the absence of prior attacks at the rest stop, the operation of an isolated facility open to the public at night may be said to have created an " 'especial temptation and opportunity for criminal misconduct . . . .' " (*Constance B.* v. *State of California, supra,* 178 Cal.App.3d at p. 206.) "It is dismally predictable that where there are highways there will be highwaymen—and worse." (*Ibid.*)

With the duty issue resolved in favor of the plaintiff, the court moved on to breach and causation (which were considered together). In *Constance B.,* where the defendant was the State of California, the plaintiff was compelled to concede there was no duty to patrol the premises. (*Constance B.* v. *State of California, supra,* 78 Cal.App.3d at p. 208, fn. 3; Gov. Code, § 845.) But the plaintiff did have several other complaints. She claimed the restroom was too far from the parking lot to permit adequate surveillance by other users, the door was on the wrong side of the building, and the building was below the grade of the freeway, all of which the court summarily rejected. (*Constance B.* v. *State of California, supra,* 178 Cal.App.3d at pp. 208-210.)

The plaintiff also claimed the placement of lights and trees, which produced heavy shadows at night, could provide concealment for a lurking assailant between the parking area and the restroom building and her expert testified that the lighting condition created a risk of injury. But the assailant in *Constance B.* was not lurking in the shadows. It was undisputed that he was standing at the corner of the restroom building, well illuminated by adequate lighting. "Being bold enough to lurk in the open in the light, staring at women entering the restroom, it is fanciful to speculate that his direct path to the restroom entry might have detoured into and then out of the shadows.

"Nor are we persuaded that the matter should go to the jury on the vague supposition that, notwithstanding that the assailant was standing in the light,

even brighter lights might have deterred the assault. This theory has nothing to do with the creation of an opportunity to commit crime by providing a place of concealment. It is premised on the notion that the assailant's psychological propensity for crime is affected by the quantity of light. It is a theory of mood lighting. If liability may be premised solely on this notion, proprietors will become the insurers of the safety of persons on their premises, subject only to the caprice of particular juries . . . . If we are unwilling as a matter of policy to insure against losses occasioned by crimes, we ought not foist that burden haphazardly on persons not at fault for criminal misbehavior. We conclude that the lighting condition was not a proximate cause of the assault." (178 Cal.App.3d at pp. 211-212.)

### 3.

*Lopez* v. *McDonald's Corp., supra,* 193 Cal.App.3d 495, is a personal injury and wrongful death action by the survivors and surviving family members of the infamous 1984 massacre at the San Ysidro McDonald's restaurant. The trial court granted summary judgment and the Court of Appeal affirmed, finding that no duty was owed but that, even assuming there was a duty, there was no causal nexus between McDonald's breach of its duty to protect its patrons from reasonably foreseeable criminal acts of third parties and the injuries suffered by these plaintiffs.

The gruesome facts are succinctly stated by the court: "On a clear and sunny day, James Oliver Huberty entered McDonald's restaurant in San Ysidro dressed in camouflage pants and armed with a 9 mm. semiautomatic rifle, a semiautomatic 9 mm. pistol and a .12 gauge shotgun. He immediately began indiscriminately slaughtering patrons and employees within the glass-enclosed structure. During the hour of terror before he was killed by a police sharpshooter, Huberty showed no intent to rob the restaurant; made no demands for money; made no effort to take hostages; loaded his weapons several times; and killed 21 people in the restaurant and wounded 11 others. His single apparent purpose was to kill as many people as possible before he himself was slain." (193 Cal.App.3d at pp. 500-501.)

The plaintiffs claimed that McDonald's failed to provide adequate safety devices or security personnel to protect customers from dangerous and known risks. The San Ysidro facility was in a high-crime area with heavy gang activity. Between January 1981 and July 1984, there were several robberies and other crimes on the premises and many more in the immediate area. In opposition to McDonald's motion for summary judgment, the plaintiffs presented expert testimony criticizing McDonald's for not having security guards on the premises. "Without citing any supporting *fact,* [the

expert] opined, 'The use of security at that site would have acted as a deterrent and could possibly have prevented the [massacre].' " (193 Cal.App.3d at p. 502.)

*Lopez* holds that on these unique, horrific facts, liability must be restricted as a matter of law. (193 Cal.App.3d at pp. 504-512.) But apart from any duty analysis, the court also held "the extraordinary facts of this case show as a matter of law there is no potential causal connection between McDonald's failure to provide security and plaintiffs' injuries." (*Id.* at p. 513.)[7]

"Assuming the special relationship between a business establishment and its customers as a matter of law places an affirmative 'duty' on McDonald's to take reasonable precautions to protect its patrons from Huberty's criminal conduct [citations], the primary issue here is causation, as it is undisputed McDonald's failed to take any protective or precautionary measures to safeguard its patrons from the reasonably foreseeable conduct of unknown third parties." (*Lopez* v. *Mc.Donald's Corp.*, *supra*, 193 Cal.App.3d at p. 513.)

Given the nonfeasance nature of McDonald's conduct, the court first addressed what reasonable protective measures McDonald's should have taken under the circumstances and concluded it should have provided such things as security cameras and alarms designed to deter theft-related and ordinary criminal conduct and a uniformed but unarmed, licensed security guard. (193 Cal.App.3d at pp. 513-515.) Next, the court had to "determine whether as a matter of law McDonald's failure to provide an unarmed security guard constitutes a proximate or legal cause of the resulting injuries . . . . All plaintiffs need to show to establish proximate, or legal, causation is that McDonald's nonfeasance in some way contributed to their resulting injuries. . . . In other words, could any jury find McDonald's failure to provide unarmed, uniformed, licensed security personnel constituted a substantial factor in causing the resulting injuries . . . , by either effectively deterring such criminal conduct or limiting the scope of the resulting injuries? Otherwise stated, McDonald's negligent conduct is not a substantial factor in bringing about plaintiffs' injuries if their injuries would have been sustained even if it had provided the unarmed, uniformed, licensed security guard. . . . More precisely, '. . . where the actor's tortious conduct consists in a failure to take some precautions which are required for the protection of another's person . . . [,] if the same harm, both in character and extent, would have been sustained even had the actor taken the required

---

[7]The opinion is authored by Justice Work. Justice Butler concurred in that portion of the opinion holding that no duty was owed and noted that he would not have reached the causation issue. Justice Weiner concurred for the reasons set forth in the causation discussion. (193 Cal.App.3d at p. 517.)

precautions, his failure to do so is not even a perceptible factor in bringing it about and cannot be a substantial factor in producing it.' . . .

"This case constitutes a classic example of plaintiffs establishing 'abstract negligence' in that McDonald's security failed to conform with their expert's notion of adequacy as requiring the hiring of a uniformed, licensed security guard, without establishing any causal nexus between this failure and the resulting injuries." (193 Cal.App.3d at pp. 515-516.) After quoting at some length from *Noble* v. *Los Angeles Dodgers, Inc., supra,* 168 Cal.App.3d at pages 916-918, *Lopez* concludes that any "reasonable protective measure such as security cameras, alarms and unarmed security guards, might have deterred ordinary criminal conduct because of the potential of identification and capture, but could not reasonably be expected to deter or hinder a maniacal, suicidal assailant unconcerned with his own safety, bent on committing mass murder." (*Lopez* v. *McDonald's Corp., supra,* 193 Cal.App.3d at p. 517.)

4.

Finally, we have *Thai* v. *Stang* (1989) 214 Cal.App.3d 1264 [263 Cal.Rptr. 202]. Tuan Thai was an unintended victim of a drive-by shooting which occurred while he was standing outside the entrance to Skateworld Roller Rink. He sued Gary Stang, the owner of the rink. Stang moved for summary judgment and offered the testimony of one of the investigating police officers who opined that the presence of a security guard on the premises "absolutely" would not have prevented the shooting. Thai offered a security expert's testimony about the occurrence of other violent acts nearby but his opposition papers did not include anything on the issue of causation. The motion for summary judgment was granted and Thai then moved for reconsideration, at which time he presented an expert's opinion that, in the presence of a uniformed guard, "the shooting 'probably would not have occurred.'" (*Id.* at pp. 1268-1269.) The motion for reconsideration was denied and the Court of Appeal affirmed.

Given the random nature of drive-by shootings, the court refused to impose on Stang the duty to protect against this type of harm. (214 Cal.App.3d at p. 1273.) The court nevertheless went on to hold that, assuming a duty was owed, "no liability should attach because Stang's purported negligence was not a proximate cause of Thai's injury as [a] matter of law." (*Id.* at p. 1273.)

"Thai contends Stang's failure to provide an unarmed security guard was a proximate cause of his injuries. The issue boils down to whether the lack of an unarmed security guard contributed in some way to the drive-by

shooting. . . . [¶] In his motion for summary judgment, Stang presented evidence . . . that the presence of a security guard in the parking lot would not have prevented the drive-by shooting. In the face of this uncontradicted evidence, Thai, in his opposition to the summary judgment motion, made no showing that a security guard in the parking lot would have prevented the drive-by shooting. On this record, we conclude Thai has failed to establish any triable issue that there was a causal connection between Stang's failure to supply a security guard and his injuries." (214 Cal.App.3d at p. 1274.)

In rejecting Thai's contention that his motion for reconsideration should have been granted, the Court of Appeal agreed with the trial court that Thai's expert's opinion was pure speculation which did not create a triable issue of fact regarding causation (or anything else). (214 Cal.App.3d at p. 1275.) In the words of the trial court, " '[c]loaking a man with the aura of ostensible expertise and saying he feels that, had there been a security guard out there, this crazy wouldn't have taken a pot shot at your client, to me, has absolutely no force and effect.' " (*Ibid.*)

## II.

■ We are persuaded by *Noble, Constance B., Lopez* and *Thai* that, as a matter of law, causation was not (and could not have been) proved in this case.

*Noble* v. *Los Angeles Dodgers, Inc., supra,* 168 Cal.App.3d at pages 916-917, cautioned that a trial in this type of case must do more than simply critique a defendant's security measures or compare them to some abstract standard espoused by the plaintiff's security expert. Yet that is precisely what happened here. Nola's expert found fault with all of USC's security efforts, including the physical plant, the number of guards and the way they worked, and explained how he could have done it all better. But Nola's expert did not, and could not, say that more security guards or guards on foot instead of in cars or lower hedges or more light would have prevented Nola's injuries. And, of course, Nola's expert conveniently ignored the fact that, on the night Nola was attacked, USC had eight officers patrolling a quarter-mile area while the Los Angeles Police Department had about the same number patrolling the surrounding ten and one-half miles.

*Constance B.* v. *State of California, supra,* 178 Cal.App.3d at pages 211-212, explained that heavy shadows produced by low lights are immaterial when an assailant is sufficiently bold to wait for his prey by the side of a well lit restroom in the middle of nowhere. Low lights and high bushes are equally immaterial where, as here, an assailant grabs his victim from behind

and it is impossible to determine whether he was lurking in a shadow or behind a tree or bush or beside a nearby fence or building.[8] Moreover, we see a distinct difference between a public restroom located at an isolated highway turn-off and a university campus. While the former could arguably be kept clear of trees and bushes, the same cannot be said about a campus. As USC's security expert noted, "I think . . . you cannot just denude the property of all shrubbery, because you are creating, then, a prison environment. . . ." In any event, there would still be no guaranty of safety. An assailant could hide behind a fence (there was one between the credit union building and the human resources center) or around the corner of a building or in any one of a dozen different places. Absolute safety is not an achievable goal.[9]

*Lopez* v. *McDonald's Corp.*, *supra*, 193 Cal.App.3d at page 517, and *Thai* v. *Stang*, *supra*, 214 Cal.App.3d at page 1274, teach that reasonable protective measures cannot stop wanton violence and that even significant increases in police personnel cannot prevent all crime or any particular crime.

We think it comes down to this: When an injury can be prevented by a lock or a fence or a chain across a driveway or some other physical device, a landowner's failure to erect an appropriate barrier can be the legal cause of an injury inflicted by the negligent or criminal act of a third person. (See, e.g., *Harper* v. *Vallejo Housing Authority*, *supra*, 104 Cal.App.2d 621; *Noble* v. *Los Angeles Dodgers, Inc.*, *supra*, 168 Cal.App.3d at pp. 917-918, quoting *Goldberg* v. *Housing Auth. of Newark* (1962) 38 N.J. 578 [186 A.2d 291, 297, 10 A.L.R. 595] ["It is an easy matter to know whether a stairway is defective and what repairs will put it in order . . . but how can one know what measures will protect against the thug, the narcotic addict, the degenerate, the psychopath and the psychotic?"].) But where, as here, we are

---

[8] Nola testified that the assailant "came from nowhere, from behind . . ." and there is no evidence at all that he was hiding in the shadows or behind a bush or tree. Although Nola's expert testified in conclusory form that, in his opinion, the foliage, inadequate light and inadequate security were "substantial factors" in causing the attack, he did not explain how he arrived at this opinion or where he thought the assailant sprang from or if it was probable that the attack would not have happened if there had been more light or lower bushes. (*Barreiro* v. *State Bar* (1970) 2 Cal.3d 912, 925 [88 Cal.Rptr. 192, 471 P.2d 992] [speculation cannot take the place of evidence].) The expert described abstract negligence but he did not provide evidence of any causal connection between the negligence and the injury. (*Noble* v. *Los Angeles Dodgers, Inc.*, *supra*, 168 Cal.App.3d at pp. 917-918.)

[9] Nola's reliance on *Peterson* v. *San Francisco Community College Dist.*, *supra*, 36 Cal.3d 799, is misplaced. *Peterson* holds only that a community college owes a duty to its students to take reasonable steps to protect them from known dangers. In *Peterson*, the plaintiff *alleged* that her attacker was hiding behind " 'unreasonably thick and untrimmed foliage and trees' " (36 Cal.3d at p. 805). *Peterson* was a pleading case (a demurrer was sustained without leave to amend) and it has nothing to do with whether the plaintiff could *prove* that the college's failure to trim the foliage and trees was a legal cause of her injuries.

presented with an open area which could be fully protected, if at all, only by a Berlin Wall, we do not believe a landowner is the cause of a physical assault it could not reasonably have prevented. (*Noble* v. *Los Angeles Dodgers, Inc., supra,* 168 Cal.App.3d at p. 918 ["No one can reasonably contend that even a significant increase in police personnel will prevent all crime or any particular crime"].)

Otherwise, where do we draw the line? How many guards are enough? Ten? Twenty? Two hundred?[10] How much light is sufficient? Are klieg lights necessary? Are plants of any kind permissible or is USC to chop down every tree and pull out each bush? Does it matter if the campus looks like a prison? Should everyone entering the campus be searched for weapons? Does every shop, every store, every manufacturing plant, have to be patrolled by private guards hired by the owner? Does a landowner have to effectively close his property and prevent its use altogether? (See *Hayes* v. *State of California* (1974) 11 Cal.3d 469, 473 [113 Cal.Rptr. 599, 521 P.2d 855].) To characterize a landowner's failure to deter the wanton, mindless acts of violence of a third person as the "cause" of the victim's injuries is (on these facts) to make the landowner the insurer of the absolute safety of everyone who enters the premises.

Who is going to pay for all this security? It is no answer to say that insurance is available. First, the cost just gets passed on to the consuming public, either by the insurer, the insured, or both. Second, insurance would not in any event have covered the punitive damages awarded in this case. So who pays? Are USC's employees willing to take a cut in pay to cover the cost of additional security? What about USC's students? How much more tuition can they afford? What happens when enrollment drops because fewer students can afford the luxury of a perfectly safe education? We could go on, but we think this makes the point.

Police protection is, and in our view should remain, a governmental and not a private obligation. Landowners in high-crime areas ought not to be forced out of the area or out of business altogether by an imposition of liability to the victims of violent crimes which the police have been unable

---

[10]"Would one guard be enough? What procedures would be necessary for the guard to prevent criminal activity? . . . . [¶] . . . In the face of an assault, [a guard] might have been justified in taking action, but his failure to do so could not be the cause of the incident." (*Tucker* v. *KFC Nat. Management Co.* (D.Md. 1988) 689 F.Supp. 560, 563-564; see also Sharp, *Paying for the Crimes of Others? Landowner Liability for Crimes on the Premises* (1987) 29 So. Tex. L.Rev. 11, 57 [a plaintiff must demonstrate specifically what added or better security could actually have done to prevent the crime or reduce the injuries; and proof "that it is considerably more probable that extra security measures would have prevented the crime is not enough to prove cause-in-fact"].)

to prevent. (See Cabrera, *Negligence Liability of Landowners and Occupiers for the Criminal Conduct of Another: On a Clear Day in California One Can Foresee Forever* (1987) 23 Cal. Western L.Rev. 165, 188 [How "would a business operating on a small profit margin fulfill its obligation in a high-crime area? If business owners absorb the high cost of protection by raising the price of their goods and services, how will the poor (who most often reside in areas where the incidence of crime is greatest) be able to meet their basic needs given the minimal financial resources available to them?"].)

Are we using causation as a smokescreen for a policy judgment on whether USC ought to be liable to Nola under the circumstances of this case? We don't think so. Although legal scholars continue to debate its meaning and its social utility (Wright, *Causation in Tort Law* (1985) 73 Cal.L.Rev. 1737; Grady, *Proximate Cause and the Law of Negligence* (1984) 69 Iowa L.Rev. 363; Kelley, *Proximate Cause in Negligence Law: History, Theory and the Present Darkness* (1991) 69 Wash. U. L.Q. 49), causation is an established element of the law of negligence in California, perhaps because it imposes rational limits on liability which otherwise attaches under the judiciary's expansive view of duty. We are faced in this case with a virtually unbroken line of cases imposing an abstract duty on USC to provide "reasonable" security to protect its invitees. But it is equally well established that abstract negligence, which is all that happened here, will not support liability.

To conclude otherwise on the facts of this case would create a form of victim compensation which is not legislatively sanctioned. In California, the Legislature has disapproved extensions of third party civil liability for the wantonly reckless acts of others (as evidenced by the amendment to section 1714 of the Civil Code to eliminate the dram shop liability judicially created in *Vesely* v. *Sager* (1971) 5 Cal.3d 153 [95 Cal.Rptr. 623, 486 P.2d 151]) and it does not take a crystal ball to predict a similar reaction to extensions of third party civil liability for the criminally violent acts of others. (Note, *California's Approach to Third Party Liability for Criminal Violence* (1980) 13 Loyola L.A. L.Rev. 535, 537-540 [existing victim compensation methods socially and morally rehabilitate both the victim and the criminal, while third party liability rehabilitates only the victim's pocketbook and shifts the focus away from the criminal's intentional misconduct, turning the third party into a "vicarious criminal"]; compare Note, *Negligence Liability for the Criminal Acts of Another* (1982) 15 J. Marshall L.Rev. 459.)

If the theoretical underpinnings of the duty cases are correct, there must be a legally sound approach to the causation issue and that is what we have attempted to articulate in this case. If there is a flaw in our analysis, we

suggest it may be time for the Supreme Court to reexamine the concept of duty it articulated in *Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d 112, in the context of a society which appears unable to effectively stem the tide of violent crime. But unless we as judges limit the duty we created, it appears inevitable that the Legislature will do it for us.

For all of these reasons, we conclude that, as a matter of law, USC's failure to deter the attack on Nola was not the cause of her injuries. (*Mitchell* v. *Gonzales, supra,* 54 Cal.3d at p. 1052 [" 'If the conduct which is claimed to have caused the injury had nothing at all to do with the injuries, it could not be said that the conduct was a factor, let alone a substantial factor, in the production of the injuries' "].)

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with directions to enter judgment in favor of USC. The parties are to pay their own costs of appeal.

Ortega, J., concurred.

**SPENCER, P. J.**—I dissent. I would affirm the judgment insofar as it awards plaintiff compensatory damages, for I perceive substantial evidence from which the jury could have found defendant's negligence was the legal cause of plaintiff's injury.

Plaintiff based her case on two related theories, one of which is that defendant negligently maintained its property in a dangerous condition by permitting dense, high foliage to grow in the area of the credit union and lighting the surrounding area inadequately. There is a dangerous condition of property when a person of ordinary prudence should have foreseen that the condition would enhance appreciably the risk of harm. (*Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200, 209 [223 Cal.Rptr. 645].)

In my view, that the evidence in the instant matter is sufficient to establish a dangerous condition of property in the immediate area of the credit union and human resources center is not open to serious question. There was dense, high, concealing foliage extending along nearly the entire front of the human resources center, and there was similar foliage in front of the credit union. Such foliage in itself deepens shadows and absorbs lighting, and there was clear evidence that the area between the credit union and the human resources center was very poorly lighted. It reasonably may be inferred that the lack of adequate lighting in that area affected the overall illumination

shed on the front of these buildings and enhanced the risk posed by the foliage.

It is settled that inadequate lighting and dense foliage can constitute dangerous conditions of property. " 'That a mugger thrives in dark public places is a matter of common knowledge.' " (*Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 812 [205 Cal.Rptr. 842, 685 P.2d 1193].) Indeed, defendant's own security force recognized the danger posed by the poorly illuminated foliage along the front of the human resources center and credit union. A person of ordinary prudence clearly would have foreseen that these conditions increased the risk of harm to passersby on a campus which had experienced a number of assaultive crimes approximately 100 yards from this area and a rape approximately 1 block away and on which the credit union was considered to have one of the highest potentials for criminal activity.

Defendant argues, however, that there is no evidence these conditions caused plaintiff's injuries, i.e., that there were reasonable steps defendant could have taken to prevent the injury or that defendant's inaction caused it, citing *Noble* v. *Los Angeles Dodgers, Inc.* (1985) 168 Cal.App.3d 912, 915 [214 Cal.Rptr. 395], and the majority opinion adopts this view. The question is not and cannot be, as *Noble* phrases it, whether defendant could have prevented plaintiff's injury. When a contributing cause of the plaintiff's injury is a third party's criminal conduct, it never can be said that any action would have prevented the crime.

The majority attempts to draw a distinction between assaultive crimes of the type committed here and crimes directed against property, implying the latter can be prevented by "mechanical devices such as locks, safes, fences, etc. which are designed to protect property by 'hardening the target,' " while it is impossible to say what would deter "conduct such as rape, robbery or physical assaults." (*Noble* v. *Los Angeles Dodgers, Inc., supra,* 168 Cal.App.3d at p. 918.) However, a determined criminal of whatever sort will not be deterred by such mechanical devices. Thus, it cannot be said that repairing a lock on a door or providing an alarm system would have prevented even a simple theft or burglary. What can be said is that the use of such security measures will reduce substantially the likelihood that a crime will occur, and it will do so even when the contemplated crime is assaultive in nature.

Accordingly, the pertinent test of causation is whether a defendant's "nonfeasance in some way contributed to [plaintiff's] resulting injuries," or constituted a substantial factor in causing the injury. (*Lopez* v. *McDonald's*

*Corp.* (1987) 193 Cal.App.3d 495, 515 [238 Cal.Rptr. 436].) It is enough to have provided an enhanced opportunity for the harm to occur, to have created an opportunity to commit crime by providing a place of concealment. (*Constance B.* v. *State of California, supra,* 178 Cal.App.3d at pp. 211-212.) In *Constance B.,* the court found there was no causation as a matter of law, in that the only reasonable inference to be drawn from the facts was that plaintiff's assailant was standing in the light when plaintiff saw him staring at her and thus could not have used the dark, shadowy areas as a place of concealment. (*Id.* at p. 211.)

The facts in this case are quite different. Plaintiff had a clear view of the area around and in front of her as she approached the credit union—until she reached the sidewalk in front of the human resources center. She did not see anyone walking or loitering in the area. As she walked along the sidewalk, beside the dense, concealing foliage, a man suddenly grabbed her from behind. She was so unaware of his presence until he grabbed her that she described him as coming "from nowhere." It reasonably may be inferred from these facts that plaintiff's assailant had concealed himself nearby, waited until she passed him, and then attacked her. It further may be inferred reasonably that either the dense foliage or a nearby dark, shadowy area provided him with his place of concealment.[1]

Moreover, the combination of thick, rather high ground cover and dense, high bushes provided a concealed, secluded spot in which plaintiff's assailant could carry out his criminal designs. While rapes may occur in open, easily observed areas, they ordinarily occur in secluded, concealing places. That is, the dense and concealing shrubbery and poor lighting facilitated the rape, providing an enhanced opportunity for it to occur. (*Constance B.* v. *State of California, supra,* 178 Cal.App.3d at pp. 211-212.) Additionally, but for the convenience of having such concealing foliage so close at hand, the assailant would have had far more difficulty in carrying out a prolonged sexual assault with little fear of discovery. Consequently, if nothing else, defendant's failure to trim or remove the foliage contributed to the scope of plaintiff's injuries. (*Lopez* v. *McDonald's Corp., supra,* 193 Cal.App.3d at p. 515.)

In contrast to *Lopez* v. *McDonald's Corp., supra,* 193 Cal.App.3d 495, it cannot be said in this case that plaintiff would have suffered the same harm

---

[1]The majority states it cannot be ascertained from the evidence whether the assailant came from the foliage or a shadowy area or from behind a nearby fence or around a nearby building corner. As plaintiff crossed 36th Street at McClintock, she could have seen anyone lurking next to the McClintock side of the human resources center—*if* that area was unshadowed and well lighted. The only other nearby fence and building corner which could have provided concealment for plaintiff's assailant both lie in an area where the lighting admittedly is inadequate, along the east side of the credit union. Consequently, these areas are shadowy places of concealment.

even if defendant had trimmed substantially or removed the foliage from in front of the human resources building and credit union and increased the lighting in the area to remove deeply shadowed places of concealment. Plaintiff was not attacked by "a maniacal, suicidal assailant unconcerned with his own safety, bent on committing mass murder," but was a victim of "ordinary criminal conduct [which may be deterred] because of the potential of identification and capture." (*Id.* at p. 517.)

Additionally, the question is not, as the majority puts it, whether a university campus arguably could be kept clear of trees and bushes. The evidence established that the area occupied by the human resources center and credit union was a site particularly vulnerable to criminal activity and it thus was of great importance that it be kept clear of concealing foliage[2] and be brightly lighted. The evidence further showed that dense foliage absorbs, or swallows, light and thus can render inadequate lighting which otherwise would be adequate. Moreover, defendant's own security officers were aware of the risk posed by the foliage in this area. No one suggested that the entire campus should be denuded of all trees and foliage, only that the foliage *in this area* should have been severely trimmed or eliminated.

The question of causation is one of fact; it is only " 'where reasonable men will not dispute the absence of causality' " that it becomes a question of law. (*Constance B.* v. *State of California, supra,* 178 Cal.App.3d at p. 207.) This is not such a case. Reasonable minds can differ as to the inferences to be drawn from the facts, and thus as to whether the physical conditions of the area around the credit union were *a* cause of plaintiff's injury. (*Id.* at p. 208.)

If in reliance on the rationale of *Noble* v. *Los Angeles Dodgers, Inc., supra,* 168 Cal.App.3d at page 918, the facts in this case are inadequate to prove causation, then causation will be impossible to prove in any case premised on a negligent failure to take reasonable precautions against the criminal activity of a third party and involving assaultive criminal conduct. If the reasoning used in *Noble* is applied, the courts in essence have created a purely theoretical cause of action for the victims of assaultive crime, one on which a plaintiff never can prevail. The cases acknowledging the duty to take reasonable precautions against third party criminal acts and liability for the breach of that duty make no distinction between property crimes and assaultive crimes, but in practical effect, the majority opinion works a sub-rosa elimination of the cause of action as to all assaultive crimes.

In summary, I would hold there is substantial evidence from which the jury could have found defendant's negligent failure to remedy a dangerous

---

[2]Not all foliage is concealing when adequately trimmed, and many trees are not concealing.

condition of property was the legal cause of plaintiff's injuries. Accordingly, I would affirm the award of compensatory damages.

A petition for a rehearing was denied July 2, 1993, and respondent's petition for review by the Supreme Court was denied September 23, 1993. Mosk, J., Kennard, J., and Arabian, J., were of the opinion that the petition should be granted.