92 Cal.Rptr.2d 103 (2000)
77 Cal.App.4th 1001
Marianne SAELZLER, Plaintiff and Appellant,
v.
ADVANCED GROUP 400 et al., Defendants and Respondents.
No. B125896.
Court of Appeal, Second District, Division Seven.
December 27, 1999.
As Modified on Denial of Rehearing January 26, 2000.
Review Granted March 29, 2000.
*104 Daniel B. Wolfberg, Santa Monica, for Plaintiff and Appellant.
Early, Maslach, Price & Baukol, Los Angeles, and Priscilla F. Slocum, Pasadena, for Defendants and Respondents.
JOHNSON, J.
In this case, the trial court reluctantly granted summary judgment against a delivery woman despite evidence the apartment complex where she was assaulted had experienced many prior crimes and similar assaults and yet had not provided adequate security. The trial court felt compelled to grant the summary judgment under the decision in Nola M. v. University of Southern California (1993) 16 Cal. App.4th 421, 20 Cal.Rptr.2d 97 (Nola M.) because the assailants had not been apprehended and the plaintiff was in no position to prove they would not have attacked her even were proper security precautions in place. We conclude that barring unusual circumstances the complete absence of required security measures is sufficient to create a triable issue this breach of duty was a contributing cause of crimes committed at the unsecured location. Accordingly, we reverse.

FACTS AND PROCEEDINGS BELOW
Consistent with the standard of review for summary judgments, we summarize the evidence from the perspective most favorable to the losing party.
At the time of this incident, March 15, 1996, appellant Marianne Saelzler was an employee of Federal Express. Respondents were owners of the Sherwood Apartments, a 300-unit apartment complex located on a several acre site in Bell Flower. Saelzler came to the complex in mid-afternoon to deliver a package to a resident. As she entered the premises, she saw two young men loitering outside a locked gate that had been propped open. While walking across the grounds she saw another young man already on the premises.
The attempt to deliver the package proved unsuccessful because the resident was not at home. While Saezler was returning down a walk path with the package in hand, three men confronted her, including the two she had seen earlier near the open gate and the third she had seen inside the complex. One of them asked "Where do you think you're going?" When she didn't reply the other said, "You're not going anywhere." Then the three of them beat her and attempted to rape her, inflicting serious injuries. After *105 assaulting Saelzler the assailants fled and were never apprehended.
Upon reviewing the record we find the trial court accurately summarized the situation at Sherwood Apartments when Saelzler's job required her to enter the complex. "Plaintiff has presented overwhelming evidence that moving defendants had knowledge of frequent, recurring criminal activity on the premises of their 28-building apartment complex. Plaintiff has provided reports showing that within the year prior to the subject incident, there were 41 reports of individuals on the premises who did not belong and who were either cited for trespass or asked to leave. On 45 occasions, perimeter fences and gate doors were reported as broken or inoperable. [¶] The list of criminal activity on the premises is long and troubling. Plaintiff has produced evidence that a gang called the 706 Hustlers may be headquartered on the premises. In the year prior to the incident, Sheriffs came to the premises approximately 50 times, close to once a week."
The record contains only a few other items of evidence not included in the trial court's summary which are relevant to respondents' knowledge of criminal activity at Sherwood Apartments. First, the "frequent, recurring criminal activity" included many incidents of gun shots on the premises, robberies, extensive sexual harassment of women, and most significantly, several assaults similar to the one against Saelzler. If Saelzler's evidence is believed, members of the 706 Hustlers regularly and brazenly strolled the grounds, frequently conducting drug transactions, hitting and intimidating other people on the premises. Much of this criminal activity was reported to the apartment management either in daily incident reports from their nighttime security officers or in police reports. Criminal activity was so rampant on the property pizza parlors refused to deliver to apartments in the complex, insisting residents come to the sidewalk if they wanted delivery of pizzas ordered by phone.
The trial court's minute order then reviews the security respondents provided at the complex. "Given the `high foreseeability' that violent crime would occur on their premises, moving defendants had a duty to provide security and to diligently repair security devices on the premises such as the locks on their gates.... Moving defendants, however, have provided no evidence about their security precautions. And Plaintiffs have provided evidence that the only precautions moving defendants have taken was in hiring security guards to patrol at night.[1] Thus, clearly an issue of fact exists as to whether moving defendants breached their duty to provide reasonable safety precautions to check [the] rampant violence." (Italics added.)
Additional facts in the record furnish further corroboration of the trial court's finding. Police several times told the apartment manager and the head of the *106 security firm Sherwood Apartments employed they should have security patrols during daytime as well as nighttime. Meanwhile, respondent's own apartment manager insisted on having security personnel escort her to her vehicle whenever she left.
Saelzler filed a lengthy declaration from a security expert, Robert Feliciano, who had reviewed the security logs and depositions, as well as personally visited the Sherwood Apartments complex. His qualifications included service as Director of Police and Safety for the Housing Authority of L.A. County, as well as advanced education in public safety and several years in law enforcement before joining the Housing Authority. At the time of the declaration he was a full-time instructor in criminal justice and police science at a community college. Feliciano expressed the opinion "that this attack, assault and battery, and attempted rape on the plaintiff would not have occurred had there been daytime security and a more concerted effort to keep the gates repaired and closed.... It is my opinion that the premises were a haven for gangsters and hoodlums which further encouraged criminal activity as evidence [sic] by the long history of criminal activity in the only one year prior to this incident."
On May 13, 1997, Saelzler filed her complaint alleging general negligence, premises liability and intentional negligence. Respondents filed a summary judgment motion on May 20, 1998, which the trial court granted on May 29, 1998. Despite finding respondents had a clear duty to provide security precautions and even more clearly breached that duty, the court reluctantly followed Nola M., an appellate decision to be discussed below, and found Saelzler had failed to prove the breach was a proximate cause of her assault.
Saelzler filed a timely appeal.

DISCUSSION
The trial court reluctantly granted summary judgment in this case with a plea: "The Court notes that the facts of this case are particularly troubling and may warrant the Court of Appeal reviewing the status of the law as it relates to the Nola M. and Leslie G. [v. Perry & Associates (1996) 43 Cal.App.4th 472, 50 Cal.Rptr.2d 785 (Leslie G.)] cases which seem to compel the ruling set forth above." The court referred to two Division One cases, Nola M., supra, 16 Cal.App.4th 421, 20 Cal.Rptr.2d 97 and Leslie G., supra, 43 Cal.App.4th 472, 50 Cal.Rptr.2d 785. While we disagree with the trial court's conclusion Nola M. and Leslie G. compelled summary judgment here, we also differ with the breadth of the rule those two decisions appear to declare. For, carried to its logical conclusionas certainly was done herethis legal principle discourages the provision of security measures by private landowners in the very situations where the need for same is greatest.
NOLA M. DOES NOT STATE THE PROPER TEST FOR CAUSATION WHEN A LANDLORD FAILS TO PROVIDE ANY SECURITY PRECAUTIONS ON PREMISES WHERE THERE IS A HIGH RISK OF CRIMINAL ASSAULT IF THOSE PRECAUTIONS ARE NOT TAKEN.
In its most recent discussion of the law governing a property owner's liability for crimes against people who are on the owner's premises, the California Supreme Court summarized certain basic principles. "To prevail on her action in negligence, plaintiff must show that defendants owed her a legal duty, that they breached the duty, and that the breach was a proximate or legal cause of her injuries. (Ann M. [v. Pacific Plaza Shopping Center (1993)] 6 Cal.4th [666] at p. 673 [25 Cal.Rptr.2d 137, 863 P.2d 207].) Since defendants obtained summary judgment in their favor, `we review the record de novo to determine whether they have conclusively negated a necessary element of the plaintiffs case or demonstrated that under no hypothesis is there a material issue of fact that requires *107 the process of trial' (Id. at pp. 673-674 [25 Cal.Rptr.2d 137, 863 P.2d 207].)
"The existence of a duty is a question of law for the court. (Kentucky Fried Chicken of Cal, Inc. v. Superior Court (1997) 14 Cal.4th 814, 819 [59 Cal.Rptr.2d 756, 927 P.2d 1260]; Ann M., supra, 6 Cal.4th at p. 674 [25 Cal.Rptr.2d 137, 863 P.2d 207].) Likewise, `[f]oreseeability, when analyzed to determine the existence or scope of a duty, is a question of law to be decided by the court.' (Ann M., supra, 6 Cal.4th at p. 678 [25 Cal.Rptr.2d 137, 863 P.2d 207].)"

"*********
"By now it is well established that landowners must maintain their premises in a reasonably safe condition, and that in the case of a landlord, the general duty of maintenance includes `the duty to take reasonable steps to secure common areas against foreseeable criminal acts of third parties that are likely to occur in the absence of such precautionary measures.' (Ann M., supra, 6 Cal.4th at p. 674, 25 Cal.Rptr.2d 137, 863 P.2d 207, italics added.)

"*********
"In Ann M., we reaffirmed our commitment to the principle that the scope of a landowner's duty to provide protection against third party crime is determined in part by balancing the foreseeability of the harm against the burden to be imposed. (6 Cal.4th at p. 678 [25 Cal.Rptr.2d 137, 863 P.2d 207].) We explained: `"`"[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required."' [Citation.]" Or, as one appellate court has accurately explained, duty in such circumstances is determined by a balancing of "foreseeability" of the criminal acts against the "burdensome, vagueness, and efficacy" of the proposed security measures. (Gomez v. Ticor [1983] 145 Cal.App.3d [622] at p. 631 [193 Cal.Rptr. 600].)' (Ann M., supra, 6 Cal.4th at pp. 678-679, 25 Cal.Rptr.2d 137, 863 P.2d 207.)" (Sharon P. v. Arman, Ltd. (1999) 21 Cal.4th 1181, 1188-1189, 1195, 91 Cal.Rptr.2d 35, 989 P.2d 121, some italics added.)
Applying these principles to the instant case, it is readily apparent why respondents did not challenge the existence or scope of their duty toward Ms. Saelzler. Here, as the trial court found, there was a "high degree of foreseeability" justifying even "burdensome" measures to prevent future harm from criminal assailants. Nor did respondents base their summary judgment on a claim they had not breached the duty they owed Ms. Saelzler. Indeed, as the trial court pointed out in its minute order, respondents failed to introduce evidence of any measures they had taken, burdensome or otherwise, to prevent crimes against persons in the common areas of the apartment complex respondents owned and managed.
Instead respondents seized on the absence of evidence about the identity of the assailants to claim Ms. Saelzler had not proved the breach of their duty to her was a proximate or legal cause of the assault on her. As mentioned above, respondents grounded this claim of lack of causation on Nola M. supra, 16 Cal.App.4th 421, 20 Cal.Rptr.2d 97 and Leslie G, supra, 43 Cal.App.4th 472, 50 Cal.Rptr.2d 785. Under the rigid causation proof standards announced in Nola M. and followed in Leslie G. respondents argue Saelzler has not yet introduced evidence foreclosing the possibility her attackers were residents of the complex. If they were, the broken gates and even the propped open locked gate through which Saelzler entered would not have been a cause of the assault *108 against her because gates are only designed to keep outsiders not residents out. As to the absence of daytime security patrols, language in Nola M. seems to suggest we can almost never know security guards would have been in the right place, e.g., in a place where their presence would have discouraged a specific crime against a specific plaintiff. So the absence of any such guards cannot be the cause of the assault against Ms. Saelzler. And finally, again under language in Nola M., the opinion testimony from appellant's security expert to the effect the crime against Ms. Saelzler would not have happened but for the lapses in respondent's security arrangements does not warrant respect.
Before discussing the causation issue, it is well to rehearse some of the salient facts.
Ms. Saelzler was a Federal Express employee seeking to deliver a package to a resident in this 28-building, 300-unit, apartment complex. In doing so, she entered an environment where there was at least a triable issue the following conditions existed:
(1) Several of the locked security gates surrounding the property were broken or propped open, creating openings through which violent criminals from the neighborhood could enter the complex's grounds from the outside.
(2) Apartment management was aware a dangerous criminal gang was headquartered in the complex and yet permitted them to remain there.
(3) There had been repeated crimes against persons within the complex, including several assaults similar to the one Ms. Saelzler suffered.
(4) The apartment manager insisted security personnel accompany her to her car because of her concerns about personal safety on the premises.
(5) Pizza restaurants considered the risk of crime so great they would not enter the apartment grounds to deliver their product to residents.
(6) No security guards or similar personnel were on duty during the daytime when this assault occurred.
If ever the possibility of criminal assaults was foreseeable, it was on this property. Yet management took no security precautions for anyone during the daytimeexcept perhaps the apartment manager, that is. So the first two elements of a negligence cause of action were clearly established and we come directly to causation and the case of Nola M., supra, 16 Cal.App.4th 421, 20 Cal.Rptr.2d 97. (Leslie G. only applies the rationale discussed in Nola M. to a slightly different situation.)
While Nola M. held the plaintiff in that case failed to prove causation, its rationale focuses more on another elementthe reasonableness of enhanced security measures. This emphasis is illustrated by just a few passages from the opinion.
"[W]here, as here, we are presented with an open area which could be fully protected, if at all, only by a Berlin Wall, we do not believe a landowner is the cause of a physical assault it could not reasonably have prevented....
"Otherwise, where do we draw the line? How many guards are enough? Ten? Twenty? Two hundred? How much light is sufficient? Are klieg lights necessary?.... Does it matter if the campus looks like a prison? Should everyone entering the campus be searched for weapons? Does every shop, every store, every manufacturing plant, have to be patrolled by private guards hired by the owner? Does a landowner have to effectively close his property and prevent its use altogether? [Citation.] To characterize a landowner's failure to deter the wanton, mindless acts of violence of a third person as the `cause' of the victim's injuries is (on these facts) to make the landowner the insurer of the absolute safety of everyone who enters the premises.
*109 "Who is going to pay for all this security? ... Are USC's employees willing to take a cut in pay to cover the cost of additional security? What about USC's students? How much more tuition can they afford? What happens when enrollment drops because fewer students can afford the luxury of a perfectly safe education?....
"Police protection is, and in our view should remain, a governmental and not a private obligation. Landowners in high-crime areas ought not to be forced out of the area or out of business altogether by an imposition of liability to the victims of violent crimes which the police have been unable to prevent...." (Nola M., supra, 16 Cal.App.4th at pp. 436-138, 20 Cal. Rptr.2d 97.)
While these are interesting policy questions they have nothing to do with causation and everything to do with the standard of care the law imposes as a result of the duty owed to provide reasonable protection against foreseeable criminal activity. For if proof of causation were the issue, property owners indeed would be liable for having failed to provide even costly security measures where the plaintiff was lucky enough to have testimony from the perpetrator stating he would not have committed the crime were those precautions in place.
Once we do address the Nola M. court's concerns about the cost of imposing a duty to provide reasonable security measures on property owners, we also must confront the cost of not imposing such a duty. More murders, rapes, robberies, assaults, and the like. The Nola M. court suggests police have exclusive responsibility for crime prevention. Private property owners, including those running huge apartment complexes, should have no responsibility to protect against crimes within their often vast private premises.
But unless and until we become a police state, police have only limited access to private premises. They may have exclusiveor at least specialresponsibility for crime prevention on the streets and even sidewalks. But they have only a minor and rather indirect role in crime prevention on private property, primarily responding to investigate criminal acts after they have occurred. As a result, if someone is to provide security precautions on private property it is going to be the property owner, not the police.
In using the rubric of causation to reduce the level of security precautions property owners must provide, the Nola M. opinion takes the formula the Supreme Courtand the Restatement of Torts adopted and stands it on end. As commonly understood, this formula means that as the danger of third party criminal conduct increases, so does the duty to provide more expensive and effective security measures to protect against the conduct. But as Nola M. would have it, as the danger increases the level of required security measures decreases. This follows because, according to Nola M., as the frequency of criminal acts increases it becomes more difficult to prove causation. It is difficult to establish a greater set of security precautions would have prevented any given criminal attack and so private property owners are excused from liability even when they supply little or none. Thus, according to Nola M., the duty to provide security precautions diminishes just when those precautions are most needed. In policy terms, this appears to be not only counterintuitive but counterproductive.
And yet common sense tells judges as well as jurors security measureswhether they be gates or lights or guards or more sophisticated approachesindeed do reduce the probability crime will occur at locations enjoying these protections. Thus, in a real sense the absence of these measures is a contributing cause of most crimes that occur on those premises.
Both the Restatement and the leading treatise on tort law recognize common sense notions of cause and effect provide sufficient proof to reach the jury on *110 the issue of causation. Furthermore, both recognize common experience tells us there is a causal link between the absence of security precautions and criminal acts that harm victims. As the Restatement Second of Torts explains the burden of proof on causation: "It is enough that [the plaintiff] introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise. If, as a matter of ordinary experience, a particular act or omission might be expected to produce a particular result, and if that result has in fact followed, the conclusion may be justified that the causal relation exists. (Rest.2d Torts, § 433B, com. b on subsection (1), at p. 443; italics added.)
The Restatement then uses three illustrations to demonstrate what it means by "ordinary experience" being sufficient to justify a conclusion that a given causal relation exists. One of those is directly applicable here. "The A University fails to provide a sufficient number of guards to police its campus. Juvenile hoodlums invade the campus, and shoot at pedestrians with airguns. B, a visitor on business at the University, is struck in the eye by a pellet fired from such a gun. On the basis of common experience that where there is proper policing such incidents usually do not occur, it may be found that the failure to provide enough guards has been a substantial factor in producing the injury." (Id. at pp. 443-444; italics added.)
Prosser and Keeton arrive at the same formulation. "Proof of what we call the relation of cause and effect, that of necessary antecedent and inevitable consequence, can be nothing more than `the projection of our habit of expecting certain consequents to follow certain antecedents merely because we had observed these sequences on previous occasions.' If as a matter of ordinary experience a particular act or omission might be expected, under the circumstances, to produce a particular result, and that result in fact has followed, the conclusion may be permissible that the causal relation exists. [¶] Circumstantial evidence, expert testimony, or common knowledge may provide a basis from which the causal sequence may be inferred .... Such questions are peculiarly for the jury; and whether proper construction of a building would have withstood an earthquake, or whether reasonable police precautions would have prevented a boy from shooting the plaintiff in the eye with an airgun, are questions on which a court can seldom rule as a matter of law. ... [T]he court can scarcely overlook the fact that the injury which has in fact occurred is precisely the sort of thing that proper care on the part of the defendant would be intended to prevent, and accordingly allow a certain liberality to the jury in drawing its conclusion." (Prosser and Keeton on Torts (5th ed. 1984) p. 270; italics added, fns. omitted.)
So under elemental common law principles the very causal connection at dispute in this case is one of those which is properly established by "common experience" and is a jury question inappropriate for summary judgment. To paraphrase Prosser and Keeton, "the injury which has in fact occurred [the assault on Ms. Saelzler] is precisely the sort of thing that proper care [in the form of adequate security precautions] on the part of the defendant would be intended to prevent, and accordingly [the court must] allow a certain liberality to the jury in drawing its conclusion." (Ibid.)
The Nola M. majority expressed disbelief at what they characterized as "dicta" in the Supreme Court's opinion, Isaacs v. Huntington Memorial Hospital (1985) 38 Cal.3d 112, 211 Cal.Rptr. 356, 695 P.2d 653, "[suggesting] that an affirmative finding of duty, which includes a finding of foreseeability, would necessarily establish causation." The Nola M. majority further *111 characterized the Supreme Court's statement as a "rather astonishing proposition" and "[w]e therefore treat the Isaacs dictum as a simple slip of the pen." (Nola M. v. University of Southern California (1993) 16 Cal.App.4th 421, 428, fn. 5, 20 Cal.Rptr.2d 97.) Perhaps the Nola M. majority would have found the Supreme Court's discussion of causation in the context of a defendant's failure to provide security precautions less "astonishing" had they considered the elemental common law principles discussed above. With those principles in mind, rather than a "slip of the pen" the Supreme Court's footnote in Isaacs emerges as "shorthand" for what the Restatement and Prosser and Keeton explain is required to reach the jury on the issue of causation in these cases.[2]
Admittedly, there are exceptions. For instance, very occasionally the evidence establishes conclusively the particular criminal could not have been deterred by the level of security a property owner could reasonably be expected to supply against foreseeable criminal activity. The archetype is the lunatic gunman who shoots up a fast food restaurant and its patrons when a reasonable level of security would have been an unarmed security guard at most. (See Lopez v. McDonald's Corp. (1987) 193 Cal.App.3d 495, 238 Cal.Rptr. 436.) Or, in a more common scenario, the defendant may be able to demonstrate the crime occurred despite its provision of a reasonable level of security. That is, it satisfied the standard of care, but the crime happened anyway. In that situation, the property owner should be relieved of liability, too. Not because of a lack of causation but because there was no breach of duty. Indeed in our view this was the situation in Nola M. itself. The defendant, USC, employed a substantial security force and put other security measures in place. The fact the rape occurred and even the probability a still larger security force might have prevented the rape the plaintiff suffered does not alter the fact USC was not negligent. It had satisfied the standard of care it had a duty to provide. So, in our view, causation was an irrelevant issue.
The instant case, however, does not fit these scenarios. This is a case where the property owner flagrantly failed to provide any securityat least during the time of day plaintiff was attacked. There is no question but this apartment complex had a duty to protect against criminal assaults of this nature. They had occurred frequently on the property and thus were highly foreseeable. As to the standard of care, the property owner completely failed any test of reasonableness by supplying no security at alland even allowing the "locked" gates to fall into disrepair. When a property owner supplies no security whatsoeverto say nothing of when it falls below the standard of care appropriate to the threat of crime on the premiseslogic and common sense tell us absence of security is a contributing cause of most crimes occurring on that property.
Not only did respondents fail to supply daytime security patrols or maintain their locked gates in an operable condition, but evidence suggests apartment management was aware one of the units *112 was the headquarters of a criminal gang and allowed the gang to remain. Furthermore, because of the lax security, other evidence suggests a high level of criminal activity was allowed to continue on the grounds of the complex. Thus, respondents bore some responsibility for the existence of the criminal environment into which Ms. Saelzler innocently entered and the presence of the criminals who cornered her and attacked her.
Having created this situation, it should not be the crime victim's responsibility to prove the behavior of her unknown assailants followed the general patterncommit crimes where and when the risk of detection is minimal or better yet non-existent and avoid committing them where the risks are significant. Instead proof of causation is lacking only when the evidence shows this particular crime was an exceptionit would have happened even had the owner satisfied the standard of care by providing a reasonable level of security precautions. The Nola M. rationale, at least as argued by respondents, would allow the exceptions to cancelrather than provethe rule. That is, it would permit unusual cases to defeat general logical propositions about the causal connection between the absence of security precautions and where and when crimes occur.
In cases like this one, where there was a clear duty to provide security and absolutely none was provided, it makes no sensein logic or in policyto hold this complete absence of security was not a cause of a given crime when that security would have substantially reduced the probability the crime would have occurred. The opposite rule elevates the possible over the probable. It also encourages property owners to ignore their duty of care. Before a defendant is allowed summary judgment the evidence should conclusively establish the general causal connection between absence of security and criminal activity does not apply in this case by showing this particular criminal would have committed this crime against this victim despite the presence of reasonable security measures. Furthermore, if the criminal cannot be caught or refuses to talk when found, it should be the negligent party, not the crime victim, who suffers the economic consequences of the absence of evidence on this question.
We also find the expert testimony from Robert Feliciano relevant on the causation issue. As will be recalled, he expressed the opinion this assault would not have occurred had respondents maintained the gates and conducted daytime patrols. Nola M. and some cases cited in that opinion discredit testimony from security experts and Nola M. held such testimony insufficient to create a triable issue a landlord's breach of duty caused the plaintiff to suffer a criminal attack. One might reasonably quarrel with the general proposition security experts are entitled to less respect than any other "expert" employed by a party to express an opinion which happens to favor that party's position. But we find it unnecessary to do so. We merely find the security expert's[3] opinion *113 testimony in this case to be probative. It is hard to imagine someone whose background better equipped him to assess this particular security situation. As the former head of security for the County Housing Authority he was responsible for security planning and administration at large public housing complexes throughout the Los Angeles basin. Who better able to evaluate the deterrent effects of certain security measures and to gauge what would happen if those precautions were not in effect. While we find appellant has created a triable issue on the causation issue even without Feliciano's testimony, we also find the opinion testimony of this particular expert both admissible and credible on that issue. We further observe respondents did not tender any expert willing to express the opinion Saelzler would have been assaulted by these three young men even if respondents had not breached their duty of care and the required security precautions had been in place.

DISPOSITION
The judgment is reversed and the cause remanded for further proceedings consistent with this opinion. Appellant to receive her costs on appeal.
LILLIE, P.J., concurs.
NEAL, J., Dissenting:
I respectfully dissent.
The trial court correctly decided on the undisputed facts, that appellant could not prove that her injuries were caused by the negligence of respondent. Appellant was required to prove that respondents legally caused her injuryin other words, that but for respondent's neglect it was more probable than not that appellant would have avoided the attack. (Leslie G. v. Perry & Associates (1996) 43 Cal.App.4th 472, 488, 50 Cal.Rptr.2d 785 [summary judgment affirmed; no proof of causation where plaintiff was raped in garage of apartment building, and contended defective security gate caused her injury]; Nola M. v. University of Southern California (1993) 16 Cal.App.4th 421, 20 Cal.Rptr.2d 97 [judgment after trial reversed; plaintiff who was raped on campus failed to demonstrate that more security guards or different security procedures would have prevented attack].)
The evidence before the trial court disproved the causation element of the negligence tort. While a gate with a working lock, or more security patrols on the property, might have lessened the general probability of criminal activity in the complex, there is simply no way to know *114 whether these precautions would have prevented the attack on appellant.
Neither appellant nor anyone else knows who the attackers were; they may have lived in the complex and possessed keys to the gate. Even if the attackers were nonresidents, a functioning gate would not necessarily have kept them out. The attackers might have followed appellant or some other tenant in while the gate was open, or climbed over the gate. The complex had numerous auto and pedestrian entrances through which the attackers might have come.
Likewise, it can not be known whether more security guards would have prevented the attack. A 300 unit, 28-building apartment complex contains many rooms, halls, entries, garages and other spaces where a rape could take place despite extensive security patrols. Again, though one can generalize that increased security patrols probably would have lessened the incidence of crime in the complex, we can never know whether they would have prevented the attack on appellant. The security officer logs in evidence did show that there were regular security patrols on the premises, and despite these, the attack on appellant, and other crimes as well, occurred. Thousands of police patrol the streets of Los Angeles; locks, gates, fences, security guards, and alarm systems proliferate; but many thousands of crimes are nonetheless committed. Criminals are highly motivated to avoid or disable security systems, defeat locks, gates and fences, and conceal their activities from police and guards. The FBI's Uniform Crime Statistics for 1998 show that only 50% of forcible rapists were arrested.
Appellant cannot show that her attack was more probably than not caused by inadequate security patrols.
I also believe that correct analysis should lead to the conclusion that respondent owed no duty of care to prevent criminal attacks on appellant or others. I recognize the authorities are to the contrary (see Nola M., supra, 16 Cal.App.4th at 438, 20 Cal.Rptr.2d 97, and cases cited at 428, n. 6, 20 Cal.Rptr.2d 97), but agree with the panel in Nola that the Supreme Court should reconsider the issue (three Supreme Court justices voted to hear Nola.).
Whether a duty of care is owed is a policy question, for courts to decide. (Bily v. Arthur Young & Co. (1992) 3 Cal.4th 370, 397, 11 Cal.Rptr.2d 51, 834 P.2d 745; Biakanja v. Irving (1958) 49 Cal.2d 647, 650, 320 P.2d 16.) An early formulation of the duty question, in traditional negligence or fault terms, appears in Biakanja, which states that duty should depend on the degree to which the transaction was intended to affect plaintiff, the foreseeability of harm to her, the degree of certainty that plaintiff suffered injury, the closeness of the connection between defendant's conduct and the injury, the moral blame attached to defendant's conduct, and the policy of preventing future harm. (49 Cal.2d at 650, 320 P.2d 16.) A court should also examine the costs and benefits of imposing a duty. (Bily, 3 Cal.4th at 404-405, 11 Cal.Rptr.2d 51, 834 P.2d 745.)
Both approaches to the duty question weigh against imposing a duty. A landlord or business owner does not intend that tenants or patrons be attacked, does not foresee injury to the specific victim (though future attacks on someone may reasonably be foreseen if other attacks have occurred), and is not "morally blameworthy" for injuries caused by a third party's crime. As pointed out above, in the causation discussion, the connection between the conduct of landlord or business owner and the injury is attenuated-it cannot reasonably be known whether a failure to increase security measures contributed to a particular attack. The policy of preventing future harm may be served, but only to an uncertain degree.
The costs of imposing a duty may well outweigh the benefits. Security guard services are labor intensive and surely not cheap, nor are fences and alarm systems. *115 As one commentator put it, "Since protection costs money, how would a business operating on a small profit margin fulfill its obligation in a high-crime area? If business owners absorb the high cost of protection by raising the price of their goods and services, how will the poor (who most often reside in areas where the incidence of crime is greatest) be able to meet their basic needs given the minimal financial resources available to them?" (Cabrera, Negligence Liability of Landowners and Occupiers for the Criminal Conduct of Another: On a Clear Day in California One Can Foresee Forever (1987) 23 Cal. Western. L.Rev. 165, 188.)
The present case illustrates this last concern. People do not choose to live in a crime-infested, gang-dominated complex because they like it, but rather because it is the only place they can afford. Added rent costs to cover verdicts or additional security guards will at best add to the burden of these poor renters, and at worst, drive them to join the thousands of homeless people on the streets. (Homelessness must result in part from governmental interventions which drive up the minimum prices for housing.) In this case, appellant was not even a resident of the complex, and the residents' additional expenditures will not benefit them (meanwhile, appellant may receive workers' compensation benefits through her employer, Fed Ex.)
Even without a duty, business owners and landlords would still provide security measures. The market would call forth these services for shoppers and tenants who wished them and were willing to pay higher prices or rents covering the added costs of the services. People of modest resources who preferred not to bear these costs would be free to make this choice, rather than compelled by court decision to bear them.
Courts are not competent to make this kind of policy decision. They are not equipped to assess the costs imposed by a duty which tends to require additional security, or to decide whether poor people should have to bear such costs.
I would affirm the trial court's ruling.
NOTES
[1] Both the head of the security firm Sherwood employed and Sherwood's own apartment manager testified there were no daytime security patrols. Respondents tendered no contrary evidence to the trial court. Nor did they even claim they provided any security guards during daytime hourseither in their Answer or the summary judgment motion. On appeal, for the first time, respondents' brief argues some of the security logs appellant attached to its expert's declaration reflect security personnel were on duty during the daytime on some days at least. At best, this conflict between the testimony of respondents' own apartment and security chief, on the one hand, and some of the security logs creates a triable issue about whether and when Sherwood Apartments provided daytime security patrols. The apartment manager's testimony does contain one possible explanation for the discrepancy. She stated she "change the security time and make them flexible, like sometimes 3:00, sometimes 5:00, sometimes 6:00, so the kids don't know what time the security come to work." Thus, it is possible the logs reflecting some daytime patrol hours were from the occasional days when the apartment manager ordered the security company personnel to arrive early. In any event, and of most relevance, nothing in the record suggests any security guards were on duty on the afternoon of March 15, 1996, when Saelzler was attacked.
[2] The footnote in question is not "dictum" in the full sense, since it disposes of an alternative grounds for the trial court's decision the Supreme Court was reversing. The footnote reads in full: "In granting the hospital's motion for nonsuit, the trial court stated that plaintiffs had failed to introduce evidence as to causation. But as Bigbee makes clear, `[a]n affirmative finding on foreseeability by the jury would obviously establish ... a sufficiently "close[] connection between the defendants'] conduct and the injury suffered."` [Citation omitted.] Thus, the erroneous foreseeability conclusion necessarily calls into question the trial court's conclusion on causation. In any event, the question of whether defendants' alleged breach of duty caused the injury was a factual one. [Citation omitted.] The evidence of foreseeability was sufficient to withstand a motion for nonsuit on the issue of causation. Thus, the trial court's finding on this point cannot be upheld." (Isaacs v. Huntington Memorial Hospital, supra, 38 Cal.3d at p. 131, fn. 8, 211 Cal.Rptr. 356, 695 P.2d 653.)
[3] We are not persuaded we should exclude or discredit expert testimony on the question whether the lack of appropriate security measures was a contributing cause of a criminal assault on a given victim at a specific time and place. What these experts are testifying about, after all, is a matter of human behavior and certain factors which influence that behavior. This is akin to other issues the courts have found proper subjects of expert testimony. For instance, the courts currently send criminal defendants away, sometimes for the rest of their lives, on the basis of "gang expert" testimony about how a defendant would behave in certain circumstances because he is a gang member. (People v. Gardeley (1996) 14 Cal.4th 605, 617-620, 59 Cal.Rptr.2d 356, 927 P.2d 713 [expert testimony concerning the culture, habits and psychology of gangs is permissible because these subjects are sufficiently beyond common experience the opinion of an expert would assist the trier of fact]; People v. Valdez (1997) 58 Cal.App.4th 494, 507, 68 Cal.Rptr.2d 135 [in murder prosecution in which gang enhancement was alleged, police officer was allowed to give expert opinion on whether the defendant acted for the benefit of a criminal street gang]; see also, 1 Witkin, Cal. Evidence (3d ed. 1999 supp.) The Opinion Rule, § 533, p. 210.) Others receive similar sentences because we allow expert testimony about the behavior of child and spouse abuse victims. (People v. Morgan (1997) 58 Cal.App.4th 1210, 1213, 68 Cal. Rptr.2d 772 [where victim of alleged domestic battery recanted at trial, expert testimony on battered woman syndrome was properly admitted to bolster her earlier assertions the defendant had beat her]; People v. Jackson (1971) 18 Cal.App.3d 504, 507, 95 Cal.Rptr. 919 [medical expert testimony about battered child syndrome was properly admitted to explain child's injuries were not inflicted by accidental means]; see also 1 Witkin, Cal. Evidence (3d ed. 1999 supp.) The Opinion Rule, § 493, pp. 191-192.) Conversely, we acquit accused murderers on the basis of expert testimony about "battered woman's syndrome" and like psychological states. (Evid. Code, § 1107, subd. (a) ["In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syndrome, including the physical, emotional, or mental effects upon the beliefs, perceptions, or behavior of victims of domestic violence . . ."]; People v. Humphrey (1996) 13 Cal.4th 1073, 1087-1088, 56 Cal. Rptr.2d 142, 921 P.2d 1 [expert testimony regarding battered women's syndrome was relevant to whether the defendant actually believed she needed to kill in self-defense]; see also 1 Witkin, Cal. Evidence (3d ed. 1999 supp.) The Opinion Rule, § 493A, pp. 192-193.) If this sort of testimony is allowed when a person's liberty and even life may be at stake, it is difficult to justify disregarding expert testimony about how criminals react to the presence of gates and guards and other security measuresand to their absencein civil cases.