[No. A100310. First Dist., Div. Four. Feb. 10, 2005.]

ELLEN DIXON et al., Plaintiffs and Respondents, v.
CITY OF LIVERMORE, Defendant and Appellant.

COUNSEL

Shaw, Terhar & LaMontagne, Ralph S. LaMontagne, Jr., and Eric A. Amador for Defendant and Appellant.

O'Reilly, Collins & Danko, Terry O'Reilly and Gary L. Simms for Plaintiffs and Respondents Ellen Dixon and Joesph Dock.

Litton & Geonetta, Thomas Marc Litton and Frederick J. Geonetta for Plaintiff and Respondent David Dixon, Jr.

OPINION

RIVERA, J.—The City of Livermore (the City) appeals after the trial court found it vicariously liable for injuries suffered by plaintiffs in a helicopter crash at an air show held at the Livermore Municipal Airport (Airport), and managed by Wings for Charity, Inc. (Wings). We conclude there is no substantial evidence to support the trial court's conclusion that Wings's negligent acts or omissions caused plaintiffs' injuries. Accordingly, there is no basis to hold the City vicariously liable, and we reverse the judgment.

## I. BACKGROUND

Plaintiff Ellen Dixon and her husband, David Dixon, attended an air show at the Airport on September 10, 1995. They took a helicopter ride piloted by James Crist (Crist). The helicopter crashed during the ride, killing David Dixon and seriously injuring Ellen Dixon.

## A. *Pretrial and Trial Proceedings*

Ellen Dixon, her son Joesph Dock, and David Dixon's son David Dixon, Jr., (plaintiffs) filed a claim against the City. They claimed the City had participated in the air show by contributing use of Airport grounds and facilities, and of various City employees, such that the City had "joint-ventured" the air show and its activities, and that it had negligently reviewed the qualifications and safety of Tri-Valley Helicopters (Tri-Valley) and Wings's air show activities.

Plaintiffs then filed this action against the City, Wings, Tri-Valley, Crist, Greenbelt Aviation (Greenbelt), Rodger Ainsworth (Ainsworth), and other defendants, including the helicopter manufacturer, alleging causes of action for negligence, strict products liability, negligent products liability, negligent infliction of emotional distress, wrongful death, and loss of consortium.[1] A jury found Crist and Tri-Valley negligent, and deadlocked on whether the City and Wings were negligent. It found the other defendants not to be negligent. The jury awarded $11,009,000 in damages, and assigned Crist 60 percent of the fault, and Tri-Valley 40 percent.

Crist moved for a mistrial, and the City joined in the motion as it related to the amount of damages. The trial court denied the motion, instead granting plaintiffs' motion to limit the retrial to the issues of the liability of the City and Wings and the apportionment of fault.

Plaintiffs settled their claims against Wings, Tri-Valley, Crist, and other defendants. The City was the sole defendant at the second trial. The parties waived a jury, and the unresolved issues with respect to the City were tried by the court.

After the retrial, the trial court issued a proposed statement of decision concluding that Wings was an independent contractor of the City; the City and Wings were engaged in a joint enterprise; Wings was negligent in its management of the helicopter operation; and the City was vicariously liable for Wings's negligence.

The City objected to the proposed statement of decision. It cited the general rule that the employer of an independent contractor is not liable for physical harm caused to others by the acts of the contractor. (See *Kinney v. CSB Construction, Inc.* (2001) 87 Cal.App.4th 28, 32 [103 Cal.Rptr.2d

---

[1] The complaint alleged Wings was "a California non-profit corporation, organized for the purpose of staging and operating the annual Wings for Charity Airshow . . . ."

594].)[2] It also argued that the evidence did not support a finding that the City and Wings were involved in a joint enterprise, and that Wings could not be both an independent contractor of the City and a member of a joint enterprise with the City.

B. *The Statement of Decision*

The trial court then issued its statement of decision.

1. *Trial Court's Factual Findings*

According to the statement of decision, the City owned and operated the Airport. Between 1969 and 1983, a series of organizations participated with the City in putting on air shows. In 1983 or 1984, the City's director of public works, Dan Lee, recommended that the City create a charitable organization for the purpose of participating in the management of the air show, and the City council approved the suggestion. With input from the City attorney, Lee drafted bylaws for the organization, Wings. Lee became Wings's first vice-chairperson. The City believed the creation of Wings was the best way to meet the objectives of raising money for charity, providing family entertainment, having volunteer involvement, increasing public awareness of and support for the Airport, providing funding for capital improvements at the Airport, and assuring continuation of the Airport.

The City and Wings entered into an "Agreement for Livermore Air Show Management". According to the agreement, Wings would provide overall management of the air show and would coordinate its decisions with the City's designated representatives.

A week before the air show, a Federal Aviation Administration (FAA) employee met with the City, Wings, and other representatives. At the meeting, it was decided that helicopter flights would be at an altitude of approximately 300 feet. Wings did not object to this decision.

In order for low-level aerobatics to occur over an airport, the FAA must waive certain federal regulations. Wings sought and received a waiver for the air show. The waiver did not include helicopter rides for hire. In an advisory

---

[2] As noted in *Kinney*, this rule is subject to many exceptions. (*Kinney v. CSB Construction, Inc., supra*, 87 Cal.App.4th at p. 32 & fn. 2.) Pursuant to Government Code section 815.4, a public entity is liable for injuries caused by the torts of its independent contractor to the same extent as it would be liable if the public entity were a private person. As noted *post*, the trial court ultimately chose not to rest the City's liability on the theory that Wings was an independent contractor. We have no occasion to consider here the applicability of any of the exceptions to the general rule of nonliability for the acts of an independent contractor.

relating to waiver for aviation events, the FAA recommended that the manager of an air show verify the qualifications of all participants at an air show, including participants in rides for hire.[3]

Tri-Valley was a tenant of the Airport, allowed under the terms of its agreement with the Airport to offer scenic helicopter rides to the public. Although the Airport was closed to ordinary traffic during the air show, Wings and the City allowed Tri-Valley to operate its rides for hire as part of the air show. Wings was aware that Tri-Valley was a tenant at the Airport and had provided rides at previous air shows. There was no evidence that Wings took any other affirmative action to verify the qualifications of Tri-Valley as an operator of helicopter rides to the public, to verify the qualifications and experience of Tri-Valley pilots, or to verify that only Tri-Valley equipment and personnel would be used in the helicopter rides.[4]

Tri-Valley's helicopter had mechanical problems in the week before the air show, and Tri-Valley contacted Ainsworth of Greenbelt to arrange a back-up helicopter. Ainsworth agreed to supply an Enstrom helicopter, pilots, and a fuel truck to Tri-Valley. The pilots were to be responsible for fueling the helicopter.

Crist was one of Ainsworth's pilots. He was an FAA-certified commercial pilot, a fact confirmed by an FAA representative either immediately before or during the air show. He had been trained by Tim Wells, a friend who was another Ainsworth pilot. Wells testified that during his helicopter training, Crist had demonstrated difficulty in executing "auto rotation" maneuvers, which are necessary to land a helicopter when it loses power. In fact, Crist had never autorotated a helicopter to the ground during training. Crist's training was primarily on a different model helicopter, which had both a fuel light and a warning siren for slow rotations; the Enstrom had neither. Crist's logbook demonstrated the number of hours he had flown helicopters, and specifically how many hours he had flown an Enstrom.[5]

---

[3] The FAA circular advisory stated: "The primary safety check-and-balance used by the aviation event organizer is the establishment of the credentials of each participant and his or her aircraft, confirmation of the participants' experience in an aviation event environment, and provision to each flying participant with the proper information regarding operations at that specific event."

[4] Although not spelled out in detail in the court's statement of decision, it is undisputed that the FAA announced it would be in charge of the helicopter ride program and that it undertook to verify the credentials of the pilots and the airworthiness of the helicopters.

[5] Although the statement of decision did not provide the numbers, Crist's logbook indicated that he had close to 1,000 hours of total helicopter flying experience, and had frequently flown an Enstrom in the months preceding the accident. Plaintiff presented evidence at trial suggesting that the number of hours Crist had reported in the Enstrom may have been inaccurate.

The City's regular fuel island, which met the requirements of the Uniform Fire Code, was closed during the air show.[6] The City also had four fuel trucks used for remote fueling; they had pumps, safety equipment, and trained personnel in accordance with the Uniform Fire Code. During the air show, at Tri-Valley's request, the City pumped fuel from a City fuel truck onto a truck operated by Greenbelt, which had a fuel tank mounted on the truck bed. The fuel was then pumped from the Greenbelt truck into the Enstrom helicopter. Wings did not check to see if Greenbelt's truck had proper pumps, safety equipment, or fuel cells, as required by the Fire Code. A City employee authorized this method of fueling, but no City personnel inspected the fuel site. The day before the accident, the helicopters were being "hot fueled," or fueled with the engine running; this is considered an unsafe practice and is not an accurate way to measure fuel. No fuel logs were kept of the pumping of fuel into the Enstrom.

The Enstrom had two fuel tanks. They could not both be fully fueled during the ride program due to the combined weight of the fuel and the passengers. As a result, Tri-Valley and Crist decided to fill only one tank; after it was filled, the fuel would level out between the two tanks. The night before the accident, one tank of the Enstrom was filled. The engine was not running at the time. The helicopter was not fueled again before the Dixons' flight.

On the morning of September 10, 1995, another Ainsworth pilot used the Enstrom, and then turned it over to Crist to fly. There was no evidence Crist inspected the amount of fuel in the helicopter.

That morning, the Dixons attended the air show and purchased a five-minute scenic helicopter ride from Tri-Valley. Crist was the pilot. He flew the helicopter at an altitude of approximately 300 feet, over inhospitable terrain. The helicopter ran out of fuel. Crist could not land safely, and the helicopter crashed.

## 2. *Trial Court's Conclusions Regarding Liability*

Plaintiffs had contended the City was directly liable for plaintiffs' injuries because of its failure to adhere to legal requirements for proper handling of fuel. The trial court rejected this basis for liability, concluding the evidence did not demonstrate a nexus between plaintiffs' injuries and the purpose of the statutes at issue. Similarly, the trial court found the City was not vicariously liable for the torts of Tri-Valley and Crist in their roles as

---

[6] The parties do not cite to the relevant provisions of the Uniform Fire Code. We draw our discussion of its requirements from the trial court's statement of decision.

independent contractors, concluding the evidence did not show that plaintiffs' injuries were caused by any breach of the City's mandatory duties relating to fuel-handling.

The trial court did, however, find the City vicariously liable for the negligence of Wings. It concluded that Wings was "more than an independent contractor and that the nature of the agency relationship created by the City with Wings resulted in a master-servant relationship akin to a typical employer-employee relationship." The court then found that "Wings, in its role as servant of the City, breached duties owed to plaintiffs to adequately investigate and supervise the operations of the helicopter rides offered by [Tri-Valley] at the Airshow." The court found that Wings failed to reasonably supervise the helicopter operation, and that this conclusion was "buttress[ed]" by the following conduct: (1) Wings failed to comply with the Uniform Fire Code, particularly with respect to safe fueling practices; (2) Wings failed to determine if Greenbelt's truck had proper pumps, safety equipment, or fuel cells; (3) Wings failed to observe that on the day before the accident, helicopters were being "hot fueled"; (4) Wings failed to inspect the landing site to ensure it complied with legal requirements; (5) Wings did not include the helicopter ride program in the FAA waiver; (6) Wings did not sufficiently evaluate the qualifications of the pilots in the ride program; (7) Wings did not ensure that the ride was flown at a high enough altitude and flown over more hospitable terrain. Furthermore, Wings's failure to ensure that Tri-Valley did not use subcontracted aircraft or pilots without Wings's knowledge showed a "dangerously laissez-faire approach" to the helicopter rides. The totality of these circumstances, according to the trial court, created "an overwhelming impression of negligent management by Wings." The trial court concluded Wings's failure to ensure that rides were offered by experienced pilots using the safest helicopters was a cause of the accident. The court found Crist 40 percent at fault to plaintiffs, Tri-Valley 30 percent, and Wings 30 percent. The City and Wings were found jointly and severally liable for 30 percent of plaintiffs' noneconomic damages and for all of their economic damages.

The trial court entered judgment against the City in the amount of $6,172,000. This appeal ensued.

## II. DISCUSSION

### A. *The Claim Adequately Informed the City of the Basis of Liability*

The City contends plaintiffs' tort claim did not adequately inform the City of the basis of liability the trial court ultimately adopted, that the City was vicariously liable for the act of Wings as its servant or employee.

Government Code[7] section 945.4 requires a plaintiff to present a claim before bringing suit against a public entity for damages arising out of an alleged tort. (*Fall River Joint Unified School Dist. v. Superior Court* (1988) 206 Cal.App.3d 431, 434 [253 Cal.Rptr. 587] (*Fall River*).) The claim must include a general description of the injuries and the names of the public employees who caused them. (*Ibid.*; § 910, subds. (d), (e).) "Furthermore, ' "If a plaintiff relies on more than one theory of recovery against the [governmental agency], each cause of action must have been reflected in a timely claim. In addition, the factual circumstances set forth in the written claim must correspond with the facts alleged in the complaint . . . ." ' " (*Fall River*, at p. 434.)

The City does not contend the *complaint* alleged causes of action not adequately pled in the tort claim; rather, it complains that the *trial court* adopted a theory of liability that was not fairly included in the claim. The tort claim did not allege that Wings was a servant or employee of the City. While the complaint contains a general allegation that each of the defendants "was an agent, servant, employee, representative and/or joint venturer of each of the remaining defendants,"[8] it does not appear that plaintiffs relied in the litigation on the theory that the City was liable for the actions of Wings as its servant or employee.[9] However, even assuming that section 945.4 prohibits the trial court (as opposed to plaintiffs) from relying on a theory not pled in the tort claim, we reject the City's contention that the tort claim did not put it on notice that plaintiffs sought to hold it vicariously liable for Wings's negligence.

■ Where a complaint is "predicated on the same fundamental facts" as those in the claim (*White v. Superior Court* (1990) 225 Cal.App.3d 1505, 1511 [275 Cal.Rptr. 706]), courts have concluded the claim did not violate section 945.4. In *White*, for instance, the plaintiff submitted a claim to a city stating a police officer had falsely arrested her and beaten her. She then filed a complaint alleging causes of action for negligent hiring, training and retention and intentional failure to train, supervise, and discipline. (*White*, at p. 1507.) The city contended these causes of action were not fairly reflected in the claim filed with the city. (*Id.* at p. 1508.) The court rejected this contention because both the complaint and the claim were predicated on the same fundamental facts—the officer's alleged mistreatment of the plaintiff. (*Id.* at p. 1511.)

---

[7] All undesignated statutory references are to the Government Code.

[8] Thus, the City's statement in its reply brief that "[o]ne searches respondents' complaint in vain for even the *slightest hint* of a master/servant allegation" is incorrect.

[9] Plaintiffs' rebuttal trial brief on the issue of joint enterprise and proposed statement of decision at the second trial relied on the theory that the City and Wings were engaged in a joint enterprise or agency, as well as on the theory that the City was liable for its own negligence.

The court in *Blair v. Superior Court* (1990) 218 Cal.App.3d 221 [267 Cal.Rptr. 13], reached a similar conclusion. There, the claim alleged the plaintiff was injured when the pickup he was riding in went out of control on an icy road that the defendant had negligently failed to maintain and sand. (*Id.* at p. 223.) The complaint included allegations that the roadway lacked guard rails or warning signs. (*Id.* at p. 224.) The court concluded the claim and the complaint were "premised on essentially the same foundation, that because of its negligent construction or maintenance, the highway at the scene of the accident constituted a dangerous condition of public property." (*Id.* at p. 226.) Similarly, in *Stevenson v. San Francisco Housing Authority* (1994) 24 Cal.App.4th 269, 276 and footnote 2 [29 Cal.Rptr.2d 398], the plaintiff had alleged in her claim that her father fell in his apartment during an earthquake and was not discovered until seven days later, that he subsequently died, and that the defendant " 'negligently owned, maintained, managed and operated the premises . . . .' " Her complaint alleged negligent failure to disclose latent defects in the public building in which the father had lived, breach of the defendant's duty to inspect the premises for safety, and negligent failure to inspect the building. (*Id.* at p. 276.) The court stated the additional allegations in the complaint "were not based on a different set of facts from those set out in the claim and [were] fairly included within the facts first noticed in the claim." (*Id.* at p. 278.)

Most recently, our Supreme Court has upheld the rule of *White* and *Blair* in *Stockett v. Association of Cal. Water Agencies Joint Powers Ins. Authority* (2004) 34 Cal.4th 441 [20 Cal.Rptr.3d 176, 99 P.3d 500]. There, the plaintiff's notice of claim against a public agency stated he had been wrongfully terminated for supporting another employee's sexual harassment complaints. The claim identified the instigator of the termination, and stated the date on which the termination occurred. (*Id.* at p. 444.) The claim was denied, and the plaintiff brought an action against the public agency, which he later sought to amend to allege he had been terminated in violation of public policy on three specific grounds. (*Ibid.*) Our Supreme Court concluded the claim adequately informed the agency of the nature of the claim, stating, "A complaint's fuller exposition of the factual basis beyond that given in the claim is not fatal, so long as the complaint is not based on an 'entirely different set of facts.' (*Stevenson v. San Francisco Housing Authority* [*supra*, 24 Cal.App.4th at p. 278].) Only where there has been a 'complete shift in allegations, usually involving an effort to premise civil liability on acts or omissions committed at different times or by different persons than those described in the claim' have courts generally found the complaint barred. (*Blair v. Superior Court, supra*, [218 Cal.App.3d] at p. 226.)" (*Id.* at p. 447.)

Stockett's additional theories were based on the same factual foundation as those in the claim, and the claim provided sufficient information to allow the public agency to conduct an investigation into the merits of the claim. (*Id.* at pp. 448–450.) In reaching this conclusion, the court distinguished various cases in which the complaint alleged liability on an entirely different factual basis from that in the tort claim. (*Id.* at p. 448 & fn. 4, discussing *Fall River, supra,* 206 Cal.App.3d at pp. 433–434 [notice of claim stated injury was caused by school's negligent maintenance of door, but complaint additionally alleged the school negligently failed to supervise students], *Lopez v. Southern Cal. Permanente Medical Group* (1981) 115 Cal.App.3d 673, 676–677 [171 Cal.Rptr. 527] [claim alleging state negligently issued driver's license to person despite epileptic condition insufficient to allow amended complaint alleging state neglected to suspend or revoke license despite failure to comply with accident reporting and financial responsibility laws], and *Donohue v. State of California* (1986) 178 Cal.App.3d 795, 803–804 [224 Cal.Rptr. 57] [claim alleging Department of Motor Vehicles negligently allowed uninsured motorist to take driving test did not provide notice of complaint's allegation that department negligently supervised and instructed driver during exam].)

■ We conclude the claim adequately informed the City that plaintiffs sought to hold it vicariously liable for the negligence of Wings. The claim alleged the City had "joint-ventured" the "Wings for Charity Airshow." This allegation would most naturally be understood to mean the City and Wings were joint venturers in the air show. " '[T]he negligence of one joint venturer or of his employees acting in connection with the joint venture is imputed to the other joint venturers.' " (*County of Riverside v. Loma Linda University* (1981) 118 Cal.App.3d 300, 312, fn. 3 [173 Cal.Rptr. 371].) The claim also informed the City that the qualifications, competency, and safety of Tri-Valley would be at issue, although this allegation was stated in terms of the City's negligence. In the circumstances, the City was not held liable on a different factual basis from that alleged in the claim.[10]

B. *There Is No Substantial Evidence That Wings's Omissions Caused Plaintiffs' Injuries*

■ The trial court concluded that Wings was negligent in its management of the air show, and that this negligence was a cause of plaintiffs' injuries. Wings is not liable for plaintiffs' injuries unless it owed plaintiffs a legal duty of care, it breached that duty, and the breach was a substantial factor in causing plaintiffs' injuries. (See *Saelzler v. Advanced Group 400* (2001) 25

---

[10] As noted above, it appears that the parties never relied on or briefed the employee/servant theory that the trial court ultimately relied on in finding the City liable. Because the City does not challenge the trial court's ruling on this ground, we do not consider the propriety of such a procedure.

Cal.4th 763, 772 [107 Cal.Rptr.2d 617, 23 P.3d 1143] (*Saelzler*).) "[A]bstract negligence," without proof of a causal connection to the injury suffered, will not support a finding of liability. (*Noble v. Los Angeles Dodgers, Inc.* (1985) 168 Cal.App.3d 912, 918 [214 Cal.Rptr. 395, 214 Cal.Rptr. 396] (*Noble*); see also *Saelzler, supra*, 25 Cal.4th at p. 773.) Proof of causation must be by substantial evidence, "and evidence 'which leaves the determination of these essential facts in the realm of mere speculation and conjecture is insufficient.' [Citations.]" (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 484 [50 Cal.Rptr.2d 785] (*Leslie G.*).) In *Saelzler*, the court concluded summary judgment was properly granted to a property owner on whose property the plaintiff had been assaulted, where the evidence showed merely a "speculative possibility" that additional security would have prevented the assault. (*Saelzler, supra*, 25 Cal.4th at pp. 766–767, 781.)

The trial court concluded that Wings committed the following acts or omissions: failure to comply with the Uniform Fire Code's requirements for fueling practices; failure to determine if Greenbelt's equipment complied with the Fire Code; failure to observe that helicopters were being hot fueled the day before the accident; failure to inspect the landing site; failure to include the helicopter ride program in the FAA waiver; failure to evaluate the pilots' qualifications; and failure to ensure that the ride was at a sufficient altitude and flown over more hospitable terrain. The court went on to state: "The Court finds that Wings did, in fact, fail to reasonably supervise the helicopter operation, and that the enumerated conduct buttresses this conclusion. One can imagine a number of different scenarios that might have resulted in injury to Airshow attendees, arising out of some or all of the above failures. These acts/omissions must be reviewed alongside the fact that [Tri-Valley] was free to sub-contract out its helicopter concession without any oversight from Wings. Even though the principals of [Tri-Valley] remained on site and in control of the concession, the ability of [Tri-Valley] to use aircraft and pilots about which Wings had neither sought nor received any prior knowledge or notice establishes a dangerously laissez-faire approach by Wings with respect to the operation of the helicopter rides at the Airshow. The totality of these circumstances create[s] an overwhelming impression of negligent management by Wings."

As we have discussed, however, there must be evidence of more than "abstract negligence"; we cannot affirm the judgment unless there is substantial evidence of a causal connection between Wings's negligent acts or omissions and plaintiffs' injuries. (See *Noble, supra*, 168 Cal.App.3d at p. 918; *Leslie G., supra*, 43 Cal.App.4th at p. 484.) We first note that of the seven instances the trial court provided of Wings's omissions, five of them (failure to comply with the Fire Code's fueling practices, failure to determine whether Greenbelt's truck complied with the Fire Code, failure to observe hot

fueling the day before the accident, failure to inspect the landing site, and failure to include the helicopter ride in the FAA waiver) have no causal connection whatsoever to the accident.[11] Indeed the trial court made no attempt to draw such a connection, instead linking Wings's "negligent management" to the accident as follows: "The cause of the accident . . . was the helicopter, while being piloted by an inexperienced pilot, running out of fuel over inhospitable terrain. There is a reasonable inference that the accident would not have occurred if (1) the helicopter did not run out of fuel; (2) the flight did not occur over inhospitable terrain; or (3) the helicopter was being piloted by a more experienced pilot. If the Wings [*sic*] had acted affirmatively to insure, or even made an inquiry to verify, that the public was being offered rides by experienced pilots using the safest helicopters, the likelihood of plaintiffs['] suffering the injuries in fact suffered would have been reasonably and prudently minimized." The question before the trial court, however, was not merely whether there was a "reasonable inference" that the accident would not have occurred but for these three factors, nor whether the risk of injury could have been "prudently minimized," but whether plaintiffs had proven by a preponderance of the evidence that an act or omission of Wings was negligent *and* a substantial factor in bringing about plaintiffs' injuries.

Our review of the record persuades us that there is no substantial evidence to support a finding that the accident was due to the negligence of Wings.[12]

First, as to the helicopter's running out of fuel, there is no evidence indicating that Wings was, or should have been, responsible for making sure the helicopter was adequately fueled. Even plaintiffs' expert, James Cheatham (Cheatham), testified that the fuel level is the sole responsibility of the pilot.

Second, as to the flight's occurring over inhospitable terrain, there is no evidence that any other route would have been safer or that the choice of route was negligent. Cheatham testified that the area where the ride was conducted contained safe areas for autorotation landings, but that Crist did not choose one of those areas. A defense expert, Terry Blumenthal, testified that Crist made a turn into inhospitable terrain, but that any route would have some inhospitable terrain, whether houses, factories, or quarries, and that the route the flight took was "as good a route as they could have chosen." While there is evidence that Crist chose an unsafe spot to land the helicopter, the

---

[11] As noted *ante*, the trial court found that the evidence did not demonstrate a nexus between plaintiffs' injuries and the purpose of the enactments at issue. Plaintiffs do not challenge this finding on appeal.

[12] Our task in reviewing the record was made far more difficult by plaintiffs' failure to provide any citations to the evidence in the record underlying the trial court's findings.

record does not indicate that the route as a whole was unsafe or that Wings was negligent in allowing the helicopter rides along that route.[13]

Third, the trial court concluded the accident might not have occurred if the helicopter had been flown by a more experienced pilot using a safer helicopter. There are two reasons why this cannot support liability. First, the issue of negligent entrustment was decided in favor of the City and Wings before the second trial began. The complaint contained a third cause of action against Wings and the City for negligent entrustment. This cause of action alleged that defendants knew or should have known that Crist was incompetent and unfit to perform the duties for which he was employed, that they breached their duty of care by "negligently hiring and supervising defendant Crist without investigating his qualification to fly the F28C, and by failing to disqualify him from participating as an Enstrom F28C helicopter pilot in the Airshow." The City won summary adjudication on this cause of action, and won a directed verdict on the "issue[] of negligent entrustment." Wings also won a directed verdict on the third cause of action and on the "issue[] of negligent entrustment." Thus, both the City and Wings were found not to be liable for hiring and supervising Crist without investigating his qualifications and for *failing to disqualify him from flying at the air show.*[14]

In any case, there is no substantial evidence that Wings was negligent in failing to check Crist's qualifications or in refusing to allow the Enstrom to be used; nor is there substantial evidence that these omissions caused plaintiffs' injuries.[15] It is undisputed the FAA informed Wings that the FAA would be responsible for the helicopter program. There is also uncontradicted evidence that the FAA checked to ensure the helicopter pilots were properly

---

[13] In fact, Chris MacDonald (MacDonald), a partner in Tri-Valley, testified that the route and the altitude were determined by a meeting with an FAA representative. Brent Rodrigues, another Tri-Valley partner, testified that he told Jayne Kruse, the director of air operations for Wings, that he thought the altitude was unsafe for the terrain. However, Rodrigues was not qualified as an expert and this testimony does not contradict the evidence provided by plaintiffs' own expert that the ride area contained safe places for autorotation landings.

[14] In the colloquy leading up to the trial court's ruling on Wings's motion for directed verdict on the third cause of action, counsel for plaintiffs articulated his understanding that the directed verdict would be narrowly based on the fact that Wings did not *hire* Crist. Counsel's observations notwithstanding, it is clear that the gravamen of the third cause of action was Wings's and the City's alleged failure to scrutinize Crist's qualifications and alleged failure to remove him as a pilot for the helicopter rides.

[15] We agree with the City that the question of whether it is the custom and practice of air show operators to demand higher qualifications than those required by the FAA is a matter that could only be decided based on expert testimony as to the standard of care in the industry. (See *Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 702 [106 Cal.Rptr. 1, 505 P.2d 193] ["[i]f the matter in issue is one within the knowledge of experts *only* and not within the common knowledge of laymen, it is necessary for the plaintiff to introduce expert opinion evidence in order to establish a prima facie case"].)

qualified, and that the Enstrom was airworthy and met FAA requirements.[16] Further, plaintiffs presented no expert testimony that it was the standard of care in the air show industry to demand that pilots have higher qualifications than those required by the FAA. It is true that plaintiffs' expert, Cheatham, testified as the owner of a helicopter company that he would not hire a pilot with Crist's experience, that Crist was not competent to operate a helicopter for hire, and that Tri-Valley's overall operation was incompetent. However, the issue here is not whether Crist's employer was negligent in hiring him (indeed, the jury in the first trial found that Crist's employer, Ainsworth, was not negligent); the issue is whether it was negligent for *Wings* not to check—and reject—a pilot who had been approved by the FAA. We see no basis to conclude Wings was negligent for failing to second-guess the FAA's judgment on whether the pilots were qualified.

More importantly, the evidence does not support a conclusion that a prudent air show operator would not have allowed Crist to fly if it had checked his qualifications. Plaintiffs' expert, Skip Lehman (Lehman), himself an aviation event producer, testified that air show producers should not just confirm the pilots have commercial licenses, but should also check their credentials and reputations. Lehman stated that he looks for "[r]eliability, safety, and experience." Crist had a commercial pilot's license. His logbook showed nearly 1,000 hours of helicopter flying time, and frequent flights in an Enstrom in the months preceding the accident. That amount far exceeded the 150 hours required for a commercial pilot certificate with a helicopter-class rating. (14 C.F.R. § 61.129(c) (2004).)[17] There was no evidence that, prior to the accident at issue, Crist had ever had an enforcement action brought against him by the FAA, or that Crist had ever been involved in any accidents while piloting a helicopter. Crist also testified that he had previous experience flying passengers for hire in the 1994 Livermore air show.[18] Although Crist's flight instructor testified that Crist had some difficulty executing autorotations during his training, there is no evidence indicating that air show operators, in addition to checking the pilots' "[r]eliability,

---

[16] The jury in the first trial found that Enstrom was not negligent and that there was no defect in the design of the Enstrom helicopter. It also found that Ainsworth, the owner of Greenbelt, which supplied the helicopter, was not negligent. It would be difficult to square a conclusion that the Enstrom was not defective and neither its manufacturer nor its supplier was negligent, with one that Wings was negligent for allowing the Enstrom to be used.

[17] As noted above, plaintiffs presented evidence at trial that the number of hours Crist reported in the Enstrom may have been inaccurate; specifically, the flight meter on the helicopter indicated that it had been flown for fewer hours than Crist reported having flown it in his logbook. However, no one argues that checking a pilot's qualifications would require not only checking the logbook, but also examining the flight meters of each of the helicopters the pilot had flown to ensure that the hours reported in the pilot's logbook were accurate.

[18] In addition, Crist testified that he believed he had ferried helicopters at another event, the Isleton Crawdad Festival, although he was not sure whether he had flown passengers. MacDonald testified that he did not recall Crist flying in previous Livermore air shows.

safety, and experience," should also locate and interview the flight instructors of each of the pilots to determine what problems they had encountered during their training. In fact, Lehman agreed that "it's nothing more than pure speculation that if Wings for Charity or the City of Livermore had played a more active role in managing the operation of this airshow that the accident would or would not have occurred," and that there was no "basis to determine whether or not the accident could have been avoided had the City and Wings actually done anything about the helicopter ride."

Plaintiffs cite *White v. Inbound Aviation* (1999) 69 Cal.App.4th 910 [82 Cal. Rptr. 2d 71] to support their argument that Wings cannot rely solely on Crist's licensure to establish his competence to fly the helicopter at the air show. In *White*, the court concluded a company that rented an airplane to a licensed pilot could be held liable for negligent entrustment of an airplane to a new pilot where the company had not performed a "high altitude checkout" with the pilot, although it knew he would be flying into the South Lake Tahoe airport, a challenging high altitude airport surrounded by mountains. (*Id.* at pp. 916–918, 920–923.) *White* does not assist plaintiffs. First, the issue in *White* is liability for negligent entrustment, an issue that we have already concluded has been eliminated from this case. (*Id.* at p. 920.) Second, the evidence in *White* indicated that the South Lake Tahoe airport was known to be "at best, a challenging airport and, at worst, a dangerous airport," and that it required special skills to take off and land there safely. (*Id.* at p. 922.) The record here does not indicate that a pilot would require special skills or training to fly the helicopter rides. This case, rather, is closer to *Lindstrom v. Hertz Corp.* (2000) 81 Cal.App.4th 644, 650 [96 Cal.Rptr.2d 874], which concluded that a car rental agency was not negligent in renting a car to a licensed driver where there was no evidence the agency knew or should have known the driver was incompetent or that the agency had knowledge of any circumstances that would put it on notice that he was incompetent.

■ We agree with plaintiffs' expert Lehman that it is speculative to conclude that the accident would not have occurred if Wings had acted differently in managing the air show. Neither the trial court nor we may engage in such speculation. (See *Saelzler, supra,* 25 Cal.4th at p. 781.) The record does not contain substantial evidence that plaintiffs' injuries were caused by the negligent acts or omissions of Wings. Accordingly, there is no basis to hold the City vicariously liable for Wings's negligence, and we must reverse the judgment.[19]

---

[19] Having concluded the record does not support the trial court's finding of liability on the part of Wings, we have no occasion to address the City's claim that it would not be vicariously liable for any acts or omissions of Wings, and we express no views on this question.

## III.  DISPOSITION

The judgment is reversed. The trial court is directed to enter judgment in favor of the City.

Kay, P. J., and Reardon, J., concurred.

A petition for a rehearing was denied March 11, 2005, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied May 18, 2005.